# ORIGINAL

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO
## CIVIL DIVISION

A 1 6 0 1 5 3 2

| | | |
|---|---|---|
| **DEBBIE & JOE RODRIGUEZ**<br>745 REEVES ROAD<br>DRY RIDGE, KY 41035 | : | Case No. |
| | : | Judge: |
| | : | |
| **Plaintiff,** | : | **COMPLAINT & JURY DEMAND** |
| | : | |
| **v.** | : | |
| | : | |
| **ABUBAKAR ATIQ DURRANI, M.D.,**<br>Serve: Orthopedic & Spine Institute<br>203 Canal Road<br>Lahore 54000 Pakistan<br>(Serve by regular mail) | : | |
| | : | **(ALL NEW DR. DURRANI CASES SHALL GO TO JUDGE RUEHLMAN PER HIS ORDER)** |
| And | : | |
| | : | |
| **CENTER FOR ADVANCED SPINE TECHNOLOGIES, INC.**<br>Serve: Orthopedic & Spine Institute<br>203 Canal Road<br>Lahore 54000 Pakistan<br>(Serve by regular mail) | : | |
| And | : | |
| | : | |
| **WEST CHESTER HOSPITAL, LLC**<br>7700 UNIVERSITY DRIVE<br>WEST CHESTER, OH 45069 | : | |
| SERVE: GH&R BUSINESS SVCS., INC.<br>511 WALNUT STREET<br>1900 FIFTH THIRD CENTER<br>CINCINNATI, OH 45202<br>(Serve via Certified mail) | : | |
| And | : | |
| | : | |
| **UC HEALTH**<br>SERVE: GH&R BUSINESS SVCS., INC.<br>511 WALNUT STREET<br>1900 FIFTH THIRD CENTER<br>CINCINNATI,OH 45202 | : | |

REGULAR MAIL WAIVER

REGULAR MAIL WAIVER

D113839554 IN1

TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH
2016 MAR 15 P 1: 23
FILED

EXHIBIT A

(Serve via Certified mail)                          :
                                                    :
      **Defendants.**                          :

---

Come now Plaintiffs, Debbie and Joe Rodriguez, and file this Complaint and jury demand and state as follows:

1.     At all times relevant, Plaintiffs were residents of and domiciled in the State of Kentucky.

2.     At all times relevant, Defendant Dr. Abubakar Atiq Durrani (hereinafter "Dr. Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3.     At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter "CAST"), was licensed to and did in fact perform medical services in the State of Ohio, and was and is a corporation authorized to transact business in the State of Ohio and Kentucky.

4.     At all times relevant, West Chester Hospital, LLC (hereinafter "West Chester Hospital"), was a limited liability company authorized to transact business and perform medical services in the State of Ohio and operate under the trade name West Chester Hospital.

5.     At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester.

6.     At all times relevant herein, West Chester Medical Center, Inc., aka West Chester Hospital held itself out to the public, and specifically to Plaintiffs, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

7.     UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC.

8.     UC Health Stored BMP-2 at UC Health Business Center warehouse located in Hamilton County.

9.     UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC. UC Health is located in Hamilton County making Hamilton County appropriate to bring this lawsuit.

10.    The subject matter of the Complaint arises out of medical treatment by Defendants in Hamilton County, Ohio.

11.    The amount in controversy exceeds the jurisdictional threshold of this Court.

12.    This case has been previously dismissed pursuant to Civ. R. 41(A)(1)(a) and is now being refiled within the time allowed by O.R.C. 2305.19.

## FACTUAL ALLEGATIONS OF PLAINTIFF

13.    Debbie Rodriguez's primary care physician, Dr. Brennan Burke, referred her to Dr. Durrani at CAST in their Blue Ash offices.

14.    At that time, Plaintiff was experiencing left and right leg radiating pain with some numbness and weakness.

15.    At the first referral meeting, Dr. Durrani informed the Plaintiff that she had "severe stenosis" and "severe degenerative disc disease." He told the Plaintiff that her discs at L1-L2 and L2-L3 were "completely gone" and that she had been born with a birth defect of her spine. At the second CAST office visit, Dr. Durrani scheduled the Plaintiff for surgery.

16.    On October 28, 2009, Dr. Durrani performed a posterior spinal fusion on Plaintiff from L3-L4 at West Chester Hospital.

17.    Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this surgery without Plaintiff's knowledge or consent, causing harm.

18.     The use of BMP-2 increases a person's chance of cancer by 3.5%

19.     Due to the unnecessary surgeries Dr. Durrani performed, Plaintiff has a 3.5% increased chance of cancer because of the use of BMP-2.

20.     As a direct and proximate result of the use and implementation of Infuse/BMP-2 Plaintiff has incurred a 3.5% increase in the risk of Cancer. As a result Plaintiff has an increased fear of Cancer.

21.     During postoperative visits at CAST, Dr. Durrani discovered that the screws implanted during her first surgery were "backing out." He scheduled her for a second surgery to repair these screws.

22.     On or around March 31, 2010, Dr. Durrani removed the previously installed screws and performed a direct lumbar interbody fusion on the Plaintiff from L3-L4 ("the second surgery") at West Chester Hospital.

23.     Dr. Durrani used Infuse/BMP-2 "off-label" in this second surgery without Plaintiff's knowledge or consent, causing harm.

24.     Following this procedure, Plaintiff experienced extreme pain in her legs and feet.

25.     On September 17, 2010, Dr. Durrani performed a bilateral laminectomy and foraminotomy on the Plaintiff from L4-L5 ("the third surgery") at West Chester Hospital.

26.     Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this third surgery without Plaintiff's knowledge or consent, causing harm.

27.     Plaintiff again suffered extreme pain in her legs and feet following this September 17 surgery. In addition, she began to suffer new pain in her neck and shoulders.

28.     During postoperative visits with Dr. Durrani Plaintiff was told only that she would need more surgery.

29.     On April 29, 2011, Dr. Durrani performed an anterior cervical discectomy and fusion on the Plaintiff from C5-C6 and C6-C7 ("the fourth surgery") at West Chester Hospital.

30.     Dr. Durrani used Infuse/BMP-2 "off-label" in this fourth surgery without Plaintiff's knowledge or consent, causing harm.

31.     Plaintiff's pain continued to grow following this fourth surgery, and her pain in her neck in shoulders became worse. Her mobility also began to degenerate following this April 29 surgery.

32.     On July 13, 2011, Dr. Durrani performed a left-side hemilaminectomy and decompression on the Plaintiff from C6-C7 ("the fifth surgery") at West Chester Hospital.

33.     Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this fifth surgery without Plaintiff's knowledge or consent, causing harm.

34.     Plaintiff's health continued to decline as her pain increased.

35.     On October 17, 2011, Dr. Durrani performed a right-side laminectomy and decompression on the Plaintiff from C5-C6 and C6-C7 ("the sixth surgery") at West Chester Hospital.

36.     Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this sixth surgery without Plaintiff's knowledge or consent, causing harm.

37.     On March 11, 2013, Dr. Durrani performed an anterior cervical discectomy and fusion on the Plaintiff from C4-C5 ("the seventh surgery") at West Chester Hospital.

38.     Upon information and belief, Dr. Durrani used Infuse/BMP-2 or Puregen "off-label" in this seventh surgery without Plaintiff's knowledge or consent, causing harm.

39.     At this point, Plaintiff was suffering from extreme pain in her back and legs. Her legs and feet would weaken and become completely numb with increasing frequency. She suffered a loss

of mobility as well as pain in her neck and shoulders that had not subsided since it appeared following her third surgery. In addition, after her last surgery in March of 2013, Plaintiff developed a serious infection in her surgical incisions.

40.     Plaintiff continued to attend follow-up appointments with Dr. Durrani at CAST until July 5, 2013, when she was told to "not come back for a while" because her insurance would no longer pay for additional procedures.

41.     Today, Plaintiff has lost a large amount of flexibility in her neck, and endures constant pain and numbness in her legs and feet. She is unable to participate in the activities that she enjoyed prior to her series of surgeries by Dr. Durrani, and is also unable to engage in intimacy with her spouse.

42.     Upon information and belief, the surgeries performed by Dr. Durrani were medically unnecessary and improperly performed.

43.     As a direct and proximate result of these surgeries and Dr. Durrani's negligence, the Plaintiffs have suffered harm.

44.     Plaintiffs did not become aware of Dr. Durrani's use of Infuse/BMP-2 until legal counsel reviewed Plaintiffs' bills.

## MORE SPECIFIC ALLEGATIONS BASED UPON DISCOVERY AND DEPOSITION TESTIMONY

45.     This information is to demonstrate the overall negligence and inappropriate actions of Dr. Durrani and the hospitals he worked with and/or for and/or in an individual capacity.

46.     Krissy Probst was Dr. Durrani's professional and personal assistant handling professional, academic, travel, surgery scheduling, his journals, his Boards, his credentialing, his personal affairs and his bills.

47.   Krissy Probst worked as Dr. Durrani's assistant for three years at Children's Hospital from 2006, 2007, and 2008.

48.   Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at Children's for his having an affair with Jamie Moor, his physician assistant.

49.   Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three other surgeons in the Orthopedic Department.

50.   Krissy Probst worked in the Orthopedic Department for eleven years from 2002-2013. She retired in May, 2013.

51.   Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

52.   According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated Dr. Durrani "like a son."

53.   According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

54.   Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

55.   Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

56.   At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

57.   Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries.  They did nothing.

58.     Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

59.     Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

60.     Dr. Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

61.     Dr. Durrani would schedule two to three spine surgeries a day at Children's.

62.     Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

63.     Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

64.     Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

65.     There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

66.     Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

67.     Dr. Durrani was dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

68.     Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

69.     Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

70.     Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

71.     Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.

72.     While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

73.     Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

74.     Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

75.     Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

76.     On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

**INFUSE/BMP-2**

## I. BACKGROUND INFORMATION

77. The Deters Law Firm, P.S.C., represents approximately 500 Plaintiffs in medical malpractice actions against a former Northern Kentucky/Cincinnati-area spine surgeon named Abubakar Atiq Dr. Durrani (Dr. Durrani), his company, Center for Advanced Spine Technologies, Inc. (CAST), and several area hospitals including, but not limited to, West Chester Hospital (WCH), University of Cincinnati Health (UC Health), Cincinnati Children's Hospital Medical Center (CCHMC), Christ Hospital, Deaconess Hospital, Good Samaritan Hospital and Journey Lite of Cincinnati, LLC (Journey Lite) (collectively Hospitals).

78. Dr. Durrani performed unnecessary, fraudulent, dangerous, and ultimately damaging surgeries on these Plaintiffs while working for and with these Hospitals.

79. The scheme and artifice to defraud that Dr. Durrani devised, executed, and attempted to execute while working for and with the Hospitals included the following patterns and practices:

        a.     Dr. Durrani persuaded the patient that surgery was the only option, when in fact the patient did not need surgery.

        b.     Dr. Durrani told the patient that the medical situation was urgent and required immediate surgery. He also falsely told the patient that he/she was at risk of grave injuries without the surgery.

        c.     Dr. Durrani often told his cervical spine patients that they risked paralysis or that his/her head would fall off if he/she was involved in a car accident, ostensibly because there was almost nothing attaching the head to the patient's body.

        d.     Dr. Durrani often ordered imaging studies such as x-rays, CT scans, or MRIs for patients but either did not read or ignored the resulting radiology reports.

e.      Dr. Durrani often provided his own exaggerated and dire reading of the patient's imaging study that was either inconsistent with or was plainly contradicted by the radiologist's report. At times, Dr. Durrani provided a false reading of the imaging.

f.      Dr. Durrani often dictated that he had performed certain physical examinations and procedures on patients that he did not actually perform.

g.      Dr. Durrani often ordered a pain injection for a level of the spine that was inconsistent with the pain stated by the patient or with that indicated by the imaging. Dr. Durrani also scheduled patients for surgeries without learning of or waiting for the results of certain pain injections or related therapies.

h.      Dr. Durrani often dictated his operative reports or other patient records months after the actual treatment had occurred.

i.      Dr. Durrani's operative reports and treatment records contained false statements about the patient's diagnosis, the procedure performed, and the instrumentation used in the procedure.

j.      When a patient experienced complications resulting from the surgery, Dr. Durrani at times failed to inform the patient of, or misrepresented the nature of, the complications.

k.      All of the above-mentioned actions were done with the knowledge, cooperation, or intentional ignorance of the Hospitals because Dr. Durrani was one of the biggest moneymakers for the Hospitals.

80.     In addition to the civil medical malpractice actions against Dr. Durrani, on August 7, 2013, he was indicted by the Federal Government for performing unnecessary surgeries and for defrauding the Medicare and Medicaid programs. Specifically, the ten-count complaint charged Dr. Durrani with health care fraud, in violation of 18 U.S.C. § 1347, and making false statements in health care matters, in violation of 18 U.S.C. § 1035. There was a subsequent superseding indictment adding over 30 counts.

81.     Following these criminal indictments, in December of 2013 and prior to the first Plaintiff's trial in these actions, Dr. Durrani fled the United States and returned to Pakistan. He has not returned to the United States to face allegations of either criminal or civil liability.

82.     Among Dr. Durrani's and the Hospitals' professional failings was the use of a synthetic bone-morphogenetic protein called BMP-2, which was marketed under the trade name "Infuse." Dr. Durrani used BMP-2/Infuse in ways that were either not approved by the federal Food and Drug Administration (FDA) or that were specifically contraindicated as noted on the FDA-approved product labeling. The Defendants had full knowledge of this fact.

83.     BMP-2/Infuse was, at the time of the surgeries in question, and currently still is manufactured by a company called Medtronic, Inc. (Medtronic).

84.     Dr. Durrani predominantly used BMP-2/Infuse on patients at WCH, which is owned by UC Health.

85.     It is Plaintiffs' position that this non-FDA-approved use of BMP-2/Infuse was not only negligent, and fraudulent, but criminal based upon the manner in which it was allowed to be used by Dr. Durrani at West Chester, all with the knowledge and full support of the Defendants.

**II.     THE PLAYERS REGARDING BMP-2**

86.  Dr. Durrani is a citizen of the Republic of Pakistan and was a permanent resident of the United States who, from approximately 2005 to 2013, worked as a spine surgeon in and around Cincinnati, Ohio, until he fled the United States to escape civil liability and criminal prosecution.

87.  Medtronic is an Irish corporation, with its principal executive office located in Dublin, Ireland, and its operational headquarters located in Minneapolis, Minnesota. Medtronic is the world's third largest medical device company and manufactures and markets BMP-2/Infuse. Medtronic sales

representatives were also present during the experimental surgeries performed on Plaintiffs, who are clients of the Deters Law Firm.

88. CAST was a corporation organized under the laws of Ohio and had business and medical offices in Florence, Kentucky and Evendale, Ohio. CAST was owned, in whole or in part, by Dr. Durrani.

89. Bahler Medical, Inc. is a manufacturer of medical implants and is a corporation located in the state of Ohio.

90. David Rattigan is an Ohio resident and was and is a sales representative for Medtronic. Further, he is affiliated with Bahler Medical, Inc., was involved in many of the transactions involving BMP-2, and was present for the experimental surgeries in which BMP-2 was used.

91. West Chester Hospital, LLC is a corporation organized under the laws of Ohio. It provides medical facilities and billing support to physicians, including Dr. Durrani, in the state of Ohio. WCH is owned by UC Health.

92. UC Health is a private, non-profit corporation organized under the laws of Ohio. It provides medical facilities, management, administrative, ancillary, and billing support to physicians, and it owns WCH.

93. CCHMC is a medical facility in Ohio where Dr. Durrani was an employee until approximately 2008.

## III. WHAT IS BMP-2/INFUSE?

94. The full name of BMP-2 is "Recombinant Human Morphogenetic Protein-2" (also called rhBMP-2). The following definitions apply:

      a.    Recombinant – Artificially created in a lab;

      b.    Morphogenetic – Evolutionary development of an organism;

      c.    Protein – Essential for growth and repair of tissue.

95. Recombinant human protein (rhBMP-2) is currently available for orthopedic usage in the United States.

96. Medtronic manufactured, marketed, sold, and distributed BMP-2 under the trade name "Infuse."

97. BMP-2 has been shown to stimulate the production of bone.

98. Implantation of BMP-2 in a collagen sponge induces new bone formation and can be used for the treatment of bony defects, delayed union, and non-union.

**BMP-2 AS A BIOLOGIC**

99.     BMP-2 is not a device, but instead it is a biologic. *See* July 2009 American Medical Association Article and 2011 Stanford School of Medicine Article.

100. According to the FDA, "[a] 'biological product' means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings (Public Health Service ActSec.351(i)1."Available

http://www.fda.gov/ICECI/Inspections/IOM/ucm122535.htm.

101.    BMP-2 is a Bone-Morphogenetic Protein that is used to promote bone creation and remolding and falls under the definition of a biologic. *See* AMA article ("bone forming properties") and Stanford Article. BMP-2 differs from a medical device in that once implanted, it can only be removed days after surgery.  If a patient had a complication due to BMP-2 and did not discover this complication until year after surgery, the patient could not have BMP-2 removed to reduce the complication because BMP-2 is so integrated into the patient's bone.

102.    A patient has a right to determine what happens to his or her body and the preservation of

that right requires that the patient be informed when a bone growth product, that causes

irreversible harm, is placed in his or her body.

**WHEN IS IT USED?**

103.    Recombinant human BMPs are used in orthopedic applications such as spinal fusions,

non-unions, and oral surgery.

104.    The bone graft contains two parts. The first is a solution of human bone growth protein or

morphogenetic protein-2. This protein is found in the human body in small dosages and is

important for the healing and formation of bones. The protein is genetically engineered to be

utilized in the Infuse Bone Graft product, and it is employed for the stimulation of formation and

growth in bones.

105.    The second part of the bone graft is an absorbable collagen sponge.

106.    Both components of the Infuse Bone Graft structure are used to fill the LT-Cage Lumbar

Tapered Fusion Device. This chamber is intended to restore the deteriorated disc space to its

original height.

107.    FDA-approved use for the Infuse Bone Graft product is only for lower back surgery using

an anterior lumbar interbody fusion (ALIF), a technique where the operation on the spine is

conducted through the abdomen.

108.    In addition, the Infuse Bone Graft product must be used in conjunction with Medtronic's

LT-Cage. Use of BMP-2 without the LT-Cage is considered an "off-label" use.

**CONTRAINDICATIONS OF USE**

109.    The FDA specifically warns against the use of Infuse in the cervical spine, citing reports of

"life-threatening complications."

110. Any use of Infuse other than in lumbar spine surgeries with the LT-Cage is considered "off-label" use

111. Infuse should never be used on the skeletally immature patient, i.e., in patients less than 18 years of age or those with no radiographic evidence of epiphyseal closure.

112. Infuse should never be used in the vicinity of a resected or extant tumor.

113. Infuse should never be used in those patients known to have active infection at the surgical site.

## RISKS ASSOCIATED WITH OFF-LABEL USE

114. When used in an off-label manner, patients may experience problems with pregnancy, including but not limited to: complications in fetal development; allergic reactions to titanium, bovine type I collagen, or bone morphogenetic protein–2; infection; the creation or intensification of tumors; liver or kidney disease; lupus or human immunodeficiency virus (HIV/AIDS); problems with radiation, chemotherapy, or steroids if a patient is malignant; paralysis; bowel and/or bladder dysfunctions; sexual disorders, including sterilization and incompetence; respiratory failure; excessive bleeding, and; death.

## IV.     THE REGULATORY PROCESS

115.    The Medical Device Amendments (MDA) to the federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., established two separate approval processes for medical devices: Pre–Market Approval (PMA) and Pre–Market Notification.[1]

116.    The FDA's PMA process is lengthy and involves extensive investigation by the FDA. The PMA application requires manufacturers to submit extensive animal and human data to

---

[1] *Fender v. Medtronic*, 887 F.Supp. 1326 fn 1 (E.D. Cal.1995).

establish their devices' safety and effectiveness. 21 C.F.R. § 814.20. Frequently, an experimental program under close FDA scrutiny must be successfully completed before FDA approval can be obtained under this process. FDA regulations also require PMA applicants to submit copies of all proposed labeling for the device. 21 C.F.R. § 814.20(b)(10). The FDA approves a PMA application only after extensive review by the agency and an advisory committee composed of outside experts. 21 C.F.R. § 814.40.[2]

117.    In contrast, the FDA's Pre–Market Notification process is more abbreviated and involves less FDA oversight. This process requires applicants to submit descriptions of their devices and other information necessary for the agency to determine whether the devices are substantially equivalent. Pre–Market Notification applicants must also submit their proposed labeling. 21 C.F.R. § 807.87. If the FDA determines that a device is substantially equivalent to a device that was on the market prior to the enactment of the MDA in 1976, the applicant is free to market the device.

118.    BMP-2 received PMA (PMA number P000058) for the Infuse/BMP-2 Lumbar Tapered Fusion Device, which PMA provided for limited use with specific requirements for its use on individuals. See Medtronic Package Insert.

**SCOPE OF THE PMA AND PRODUCT LABELING**

119.    The PMA for BMP-2 provided that the product may only be used in patients with the following characteristics:

        d.      Skeletally mature patient, AND

        e.      At levels L2-S1, AND

        f.      Confirmed degenerative disc disease (DDD), AND

---

[2] *Fender v. Medtronic*, 887 F.Supp. 1326 fn 1 (E.D. Cal.1995).

g.    Using only an open anterior or anterior laparoscopic approach, AND[3]

h.    Six months of non-operative treatment prior to treatment with the device, AND

i.    In combination with the metallic LT-CAGE.[4]

See Medtronic Package Insert, "INDICATIONS."

120.    According to Medtronic's package insert for BMP-2/Infuse as well as other industry literature, the following risks are associated with the use of BMP-2/Infuse:

A.    Male Sterility

B.    Cancer

C.    Increased progression of cancer

D.    Suffocation of the cervical region

E.    Bone fracture

F.    Bowel/bladder problems

G.    Loss of spinal mobility or function

H.    Change in mental status

I.    Damage to blood vessels and cardiovascular system compromise

J.    Excessive bone mass blocking the ability to treat pain

K.    Damage to internal organs and connective tissue

L.    Death

M.    Respiratory problems

N.    Disassembly and migration of components

O.    Dural tears

P.    Ectopic and exuberant bone formation

---

[3] The anterior interbody fusion approach was developed because the risk of non-union (pseudarthrosis) is significantly higher in posterior approaches. The biggest risk factor for fusion surgery is non-union.

[4] Instrumented fusions involve hardware and are more stable fusions with a shorter recovery time than non-instrumented fusions.

Q.      Fetal development complications (birth defects)

R.      Foreign body (allergic) reaction

S.      Gastrointestinal complications

T.      Incisional complications

U.      Infection

V.      Insufflation complications

W.      Neurological system compromise

X.      Non-union

Y.      Delayed union

Z.      Mal-union

AA.     Change in curvature of spine

BB.     Retrograde ejaculation

CC.     Scars

DD.     Tissue and nerve damage

EE.     Itching

FF.     Pain

GG.     Hematoma

HH.     Anaphylactic reaction

II.     Elevated erythrocyte sedimentation rate

121.   Injury Percentages:

j.      Ectopic Bone Growth-63%

k.      Inflammatory Neuritis-15%

l.      Osteolysis/Subsidence-13%

m.      Acute Swelling-7%

n.      Retrograde Ejaculation-2%

o.     85% of time, BMP-2 implanted in off-label use

122.    Not a single one of these risks in the last two paragraphs were ever explained to a single patient at Children's Hospital by Dr. Durrani.

123.    BMP-2 was NOT approved by the FDA for use in the cervical and thoracic spine and BMP-2 was NOT safe or approved for use in children less than 21 years of age. These uses are considered "off-label."

## "OFF-LABEL" USE

124.    A use of a device is considered "off-label" if it is not approved under the Pre-Market Approval process OR cleared for such use pursuant to 21 U.S.C. § 360c(f) (also known as "the 510k premarket notification process").

125.    Infuse can be implanted in an off-label manner in three ways:

        p.     Approach/position: Any approach other than an anterior approach;

        q.     Product: Failure to use LT-Cage (or any cage); mixing rhBMP-2 with other grafting products like Allograft or Autograft;

        r.     Discs: Use on multiple levels or on a level outside of L2-S1.

126.    Dr. Durrani and the Hospitals in which he performed surgeries repeatedly used BMP-2 in these non-FDA-approved manners.

## THE NON-COMPLIANCE WITH THE REGULATORY PROCESS

127.    The PMA 000058 "Conditions of Approval" specifies the following condition: "Before making any change affecting the safety or effectiveness of the device, submit a PMA supplement for review and approval by the FDA … [a] PMA supplement or alternate submission shall comply with applicable requirements under 21 C.F.R. 814.39[.]"

128.    21 C.F.R. 814.39 requires a PMA supplement pursuant to subsection (a)(1) for new indications of use of the device and pursuant to subsection (a)(6) for changes in components.

129.    The PMA 000058 "Conditions of Approval" notes the post-marketing reporting requirement imposed by 21 C.F.R. 814.84, particularly "Identification of changes described in 21 C.F.R. 814.39(a)." Medtronic did not comply with this requirement relating to the intended uses and componentry.

130.    The FDA can impose post-approval requirements in the PMA pursuant to 21 C.F.R. 814.82, and this fact results in the device being characterized as "restricted" pursuant to 21 U.S.C. § 360j(e) for purposes of 21 U.S.C. § 352(q). Section 352(q) states that any restricted device that is distributed or offered for sale with false or misleading advertising is "misbranded."

131.    "Indications for use" is a necessary part of the PMA application and the "Indications for use" are required to be limited by the application. Any different use is inconsistent with the PMA.

132.    A device that fails to meet the requirements of the PMA or 21 C.F.R. 814 is "adulterated" as defined by 21 U.S.C. § 351(f).

133.    21 C.F.R. 801.6 defines a misleading statement related to a DIFFERENT device contained in the label delivered with the device intended to be used will render the device to be used misbranded.

134.    Medtronic did not apply for a PMA supplement, as required by the FDA generally and PMA 000058 specifically, for the off-label uses, nor did it provide warnings of the risks known about the off-label uses. All named Defendants in these cases knew about the occurrences of off-label use.

135.    The PMA requires an application prior to marketing for new indicated uses by incorporating the federal requirements and explicitly reciting the text of 21 C.F.R. 814.39 and 814.84 and by specifically stating the range of indicated uses on the PMA.

## V.  MEDTRONIC

136.    In or about 2001, Medtronic began preparing for the launch of two spinal fusion products,

PYRAMID and INFUSE (BMP-2), which it projected would enjoy broad application with spinal

surgeons and their patients on a nationwide basis.

137.    Medtronic anticipated that both products would initially be limited in application.

138.    Motivated by greed and a desire to gain competitive advantage in the marketplace,

Medtronic began a course of conduct designed to broaden the application of both products by

end-users. The course of conduct involved fraud, false statements, material misrepresentation,

and deceit for the purpose of broadening the sales of these products beyond that which the usual

acceptance within the scientific community or regulatory approval would otherwise allow.

139.    On or after July 2, 2002, Medtronic received notification that its Pre-Market Approval

application for its BMP-2/Infuse bone graft products had been approved by the FDA. However,

such approval was limited to the application of the device from the L4 through S1 levels.

Further, the approval mandated the conduct of post-approval studies to evaluate the long-term

performance of the BMP-2 bone graft and to study the potential side effects and complications

such as the promotion of tumors by the bone morphogenetic protein component of BMP-2. Other

studies were conducted as well. See "Allegations against Medtronic in the Unsealed Mississippi

False Claims Case."

140.    Medtronic engaged in a fraudulent course of conduct designed to maximize its revenues

from BMP-2, regardless of whether it would eventually be allowed to remain on the market.

141.    One of the physicians Medtronic co-opted into its fraudulent scheme was a Thomas A.

Zdeblick, M.D. Dr. Zdeblick was an orthopedic surgeon whose invention, the LT-Cage, was the

only approved device to act as the delivery vehicle for BMP-2 into the body.

142.    Dr. Zdeblick enjoyed a position within the scientific community as a Key Opinion Leader, and he was both a practicing orthopedic surgeon and professor at the University of Wisconsin.

143.    In one of Dr. Zdeblick's first attempts to tout his LT-Cage and rhBMP-2, which would become the active ingredient in the ultimate Infuse/BMP-2 product, he encountered some drawbacks to his goal of promoting his and Medtronic's products, which arose from the policy of certain industry journals, including the journal *Spine,* which followed industry standards before printing peer-reviewed material. See article in the journal *Spine,* published in 2000.

144.    Not only were the drawbacks related to industry publishing standards, but the National Consumer Health Information and Health Promotion Act of 1976 enacted certain provisions at 42 U.S.C. § 300u, et seq., whereby the Federal Government had entered the field of medical research publication. Such standards promulgated by the Secretary of the predecessor to the U.S. Department of Health and Human Services required that applications for grants and contracts must be subject to "appropriate peer review." See 42 U.S.C. § 300u-1.

145.    The drawbacks encountered with the peer-reviewed *Spine* article were as follows:

        a.    Attribution that the study was "sponsored by Medtronic Sofamor Danek, Inc.;"

        b.    The study was conducted under FDA regulations, and was "...designed as a prospective, multicenter, nonblinded, randomized, and controlled pilot study;" and

        c.    It was accompanied by a cautionary comment, or Point of View, which minimized the exuberance and import of the article.

146.    In the article, BMP-2 was touted by Zdeblick and the co-authors as the potential realization of a dream of Dr. Marshall Urist, a revered pioneer in the industry and discoverer of BMP, where it closed with the following: "...it is encouraging to note that Marshall Urist's seminal observation made more than 34 years ago may finally come to clinical fruition."

147. In the Point of View, a Dr. John O'Brien of London questioned whether there could be long-term problems associated with the product. He treated Zdeblick's study with caution and pointed out that simple plaster of Paris has achieved the same or similar results more than 50 years prior. He posited that, "[p]erhaps vascularization...fixation procedures are as important as the biochemical composition of the 'filler.'"

148. Vascularization is achieved through removal of the disc material between two vertebral bodies and then the scraping of the surfaces of the vertebral bodies in a fusion procedure; fixation is the process of securing the motion segment through medical hardware. In other, if the alternative proposed by Dr. O'Brien proved to achieve equivalent or better results, Zdeblick and Medtronic's Infuse/BMP-2 products would be useless and unnecessary.

149. Certain efforts would follow in an attempt to alleviate the drawbacks encountered with the 2000 *Spine* journal article.

150. In 2002, Dr. Zdeblick was installed as the sole editor-in-chief of a medical journal known prior to his installation as the *Journal of Spinal Disorders*. Prior to his installation, the journal enjoyed a fourteen year history under the co-editorship of Dr. Dan Spangler and Dr. Tom Ducker. Once installed, Dr. Zdeblick successfully supplanted Drs. Dan Spengler and Tom Ducker and became the sole editor-in-chief, a position which would enable him to have greater control and would aid his participation in the fraudulent scheme.

151. During this same time period, Dr. Zdeblick also enjoyed a position on the associate editorial board of the medical journal *Spine*, the leading publication covering all disciplines relating to the spine.

152.    In one of Dr. Zdeblick's actions as editor-in-chief, he set about re-purposing the journal in a way that would aid him in the furtherance of the fraudulent scheme through the streamlining of the publication process.

153.    In furtherance of the fraudulent scheme, Dr. Zdeblick re-purposed the journal and renamed it the *Journal of Spinal Disorders and Techniques* (JSDT), announcing that the new journal was "entering a new partnership with *Spine*." As part of this partnership, *Spine* would "continue to function as a broad-based scientific journal" tailored to both clinicians and scientists. However, the *Journal of Spinal Disorders and Techniques* would be directed solely to physicians in clinical practice.

154.    Dr. Zdeblick's stated goal was "to provide a forum for up-to-date techniques...", and in furtherance of that goal, Dr. Zdeblick announced that his journal would publish Class II or better clinical articles but would "occasionally accept cutting edge articles with less than one year follow-up." To justify this streamlined process, Dr. Zdeblick claimed as his goal the ability of his journal "to keep up with the fast pace of progress in the treatment of spinal patients."

155.    Arm-in-arm with Medtronic and others, Dr. Zdeblick would in short order abuse his position of trust as the editor-in-chief of JSDT.

156.    In the October 2002 edition, JSDT published an article entitled, "Anterior Lumbar Interbody Fusion using rhBMP-2 with Tapered Interbody Cages." This article was co-authored by, among others, Curtis A. Dickman, M.D., who was a developer of Medtronic's PYRAMID plate and who has been paid significant sums by Medtronic through royalty agreements, consulting agreements, and education training and speaking agreements.

157.    In addition to his interest in the PYRAMID plate, Dr. Dickman had assisted Medtronic in the approval process for Infuse/BMP-2. As part of the pre-approval hearing process, Dr.

Dickman and his Barrow Neurological Associates Group of Phoenix, Arizona had submitted a letter to the meeting of the FDA's Orthopedics and Rehabilitation Devices Advisory Panel, which met on January 10, 2002. In that letter, Dr. Dickman represented that "approval of BMP would provide a significant advance for patient outcome and satisfaction following spinal fusion."

158.    In the October 2002 issue of JSDT touting the benefits of Infuse/BMP-2, Zdeblick and others failed to disclose their financial ties to Medtronic, though industry standards require such acknowledgement. Not only did Dr. Zdeblick fail to disclose that he profited from each and every surgery which Infuse/BMP-2 was used through rights in the exclusive delivery vehicle, his LT-Cage, but no reference whatsoever to their financial ties to Medtronic was made either by Dr. Zdeblick or Dr. Dickman.

159.    For years, the recognized gold standard for spinal bone grafts has been the use of autogenous bone, or bone harvested from the patient's own iliac crest, or hip bone. Medtronic designed to have its Infuse/BMP-2 product supplant autogenous bone as the gold standard in the medical community, and utilized false statements, a fraudulent enterprise and the support of Federal funds to do so.

160.    As part and parcel of Medtronic's fraudulent scheme, the October 2002 study was published in Dr. Zdeblick's journal three months after Medtronic received FDA approval for Infuse. As the article shows, it was actually received on March 28, 2002 or after Dr. Zdeblick had accomplished installment as the editor-in-chief, and was accepted by Dr. Zdeblick's journal for publication on July 30, 2002.

161.    At the same time Dr. Zdeblick's journal was publishing the initial article on Infuse, Dr. Zdeblick was already finalizing and preparing for subsequent publication a follow-up article to

tout Infuse potentially as the new gold standard. A second article, co-authored by Dr. Zdeblick and two other co-authors of the original article, was entitled "Is Infuse Bone Graft Superior to Autograft Bone? An Integrated Analysis of Clinical Trials using the LT-Cage Lumbar Tapered Fusion Device."

162.    This second article was published in Vol. 2 of 2003 and once again, there was no mention of Dr. Zdeblick's financial ties to Medtronic.

163.    This second article would serve as the second covert advertisement for the Infuse product, and the article states that "the purpose of our analysis was to investigate the potential statistical superiority of Infuse bone graft to autograft..."

164.    This second article went on to announce the July 2002 FDA approval of rhBMP-2.

165.    This article included as an "acknowledgment" an expression of gratitude to the physicians "who provided patients for this study and to the clinic research group at Medtronic Sofamor Danek for their help in data collection and statistical analyses." However, the article still failed to advise the medical community that some or all of the authors reaching these conclusions touted as monumental had direct financial interests tied to those conclusions.

166.    Rather, the failure to report these clear conflicts of interest on the part of those holding positions of trust both within the medical community and over patients was part of Medtronic's fraudulent enterprise. However, unchecked by appropriate peer review, Medtronic was able to systematically accomplish their goals.

167.    In its 2003 Annual Report, and without recognizing that Zdeblick was being paid by Medtronic, Medtronic cited to Zdeblick's 2003 as reporting that Infuse "...may become the new gold standard in spinal fusion surgery."

168. By its 2006 Annual Report, if not earlier, Medtronic had removed all doubt, declaring that after its introduction in 2002, "Infuse Bone Graft quickly became the gold standard for certain types of lumbar fusion."

169. Medtronic's fraudulent scheme was successful and resulted in a revenue stream ranging from 700 to 900 million dollars per year.

170. It has been reported that around the same time these stories about Infuse were published, editors at the Spine Journal began receiving complaints from doctors around the country who were pointing out contradictions between papers published by doctors with financial ties to Medtronic and other data involving Infuse complications.' See *Journal Sentinel* article of John Fauber.

171. Through the use of these sham consulting, royalty and education/training agreements with its physician agents in this fraudulent enterprise, Medtronic has reaped windfalls in the billions of dollars. Medtronic has used this fraudulent enterprise and civil conspiracy to drive its vast profits and enhance its market position beyond that which it would have realized without engaging willfully, knowingly and potentially deliberate, conscious, or reckless indifference in the fraudulent enterprise and fraudulent concealment. See Mississippi case.

172. Defendants had full knowledge of all these facts pertaining to Medtronics.

**VI.   FDA PUBLIC HEALTH NOTIFICATION**

173. On July 1, 2008 the FDA issued a Public Health Notification entitled "Life-Threatening Complications Associated with Recombinant Human Bone Morphogenetic Protein in Cervical Spine Fusion."

174. This notification was sent to health care practitioners all across the United States warning of the complications associated with BMP-2, specifically when used in the cervical spine.

175.    In the notification the FDA stated they received at least 38 reports of complications during the prior four years with the use of BMP-2 in cervical spine fusions.

176.    The complications were associated with swelling of the neck and throat areas, which resulted in compression of the airway and/or neurological structures in the neck.

177.    Some reports describe difficulty swallowing, breathing or speaking and severe dysphagia following cervical spine fusion using BMP-2 products had also been reported.

178.    The notification further stated that, "since the safety and effectiveness of rhBMP for treatment of cervical spine conditions has not been demonstrated, and in light of the serious adverse events described above, FDA recommends that practitioners either use approved alternative treatments or consider enrolling as investigators in approved clinical studies.

179.    The Notification further emphasized the importance of fully informing patients of these potential risks and said that patients treated with BMP-2 in the cervical spine should know:

s.    The signs and symptoms of airway complications, including difficulty breathing or swallowing, or swelling of the neck, tongue, mouth, throat and shoulders or upper chest area

t.    That they need to seek medical attention immediately at the first sign of an airway complication

u.    That they need to be especially watchful 2-14 days after the procedure when airway complications are more likely to occur

v.    rhBMP-2 (contained in Infuse Bone Graft) has received pre-market approval for fusion of the lumbar spine in skeletally mature patients with degenerative disc disease at one level from L2-S1 and for healing of acute, open tibial shaft fractures stabilized with an IM nail and treated within 14 days of the initial injury.

180. Additionally, BMP is not approved in any manner for use in patients who are skeletally immature (<18 years of age) or pregnant.

181. Dr. Durrani and the Hospitals ignored ALL of these warnings and used BMP-2 in cervical spine surgeries, children, and those with known compromising factors such as osteoporosis, smoking, and diabetes.

182. Furthermore, the Notification stated that the FDA requires hospitals and other user facilities to report deaths and serious injuries associated with the use of medical devices.

183. The Hospitals that allowed Dr. Durrani to use BMP-2 in their facilities failed to report any complications resulting from his use of BMP-2.

## VII.   SENATE FINANCE COMMITTEE REPORT

184. Medtronic's actions did not go unnoticed, and in June of 2011 the Senate Finance Committee began an investigation into the fraudulent actions of Medtronic.

185. Medtronic produced more than 5,000 documents pertaining to 13 different studies of BMP-2 for the investigation.

186. On October 25, 2012, Senate Finance Committee Chairman Max Baucus (D-Mont.) and senior member Chuck Grassley (R-Iowa) released the results of their 16-month investigation into Medtronic, which revealed questionable ties between the medical technology company and the physician consultants tasked with testing and reviewing Medtronic products.

187. The investigation revealed that Medtronic employees collaborated with physician authors to edit and write segments of published studies on BMP-2/Infuse without publicly disclosing this collaboration.

188. These fraudulently-produced studies may have inaccurately represented BMP-2's risks and may have placed added weight on the side effects of alternative treatments.

189.    The Senate investigation further found that Medtronic also maintained significant, previously undisclosed financial ties with physicians who authored studies about BMP-2, making $210 million in payments to physicians over a 15-year period.

190.    Senator Baucus stated, "Medtronic's actions violate the trust patients have in their medical care. Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has. Patients everywhere will be better served by a more open, honest system without this kind of collusion."

191.    Senator Grassley stated, "The findings also should prompt medical journals to take a very proactive approach to accounting for the content of the articles along with the authorship of the articles and the studies they feature. These publications are prestigious and influential, and their standing rests on rigorous science and objectivity. It's in the interest of these journals to take action, and the public will benefit from more transparency and accountability on their part."

192.    Major findings of the investigation include:

> a.    Medtronic was involved in drafting, editing, and shaping the content of medical journal articles authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's role in authoring or substantially editing these articles was not disclosed in the published articles. Medical journals should ensure that any industry role in drafting articles or contributions to authors is fully disclosed.

> b.    Medtronic paid a total of approximately $210 million to physician authors of Medtronic-sponsored studies from November 1996 through December 2010 for consulting, royalty and other arrangements.

c. An e-mail exchange shows that a Medtronic employee recommended against publishing a complete list of adverse events, or side effects, possibly associated with BMP-2/Infuse in a 2005 *Journal of Bone and Joint Surgery* article.

d. Medtronic officials inserted language into studies that promoted BMP-2 as a better technique than an alternative by emphasizing the pain associated with the alternative.

e. Documents indicate that Medtronic prepared one expert's remarks to the FDA advisory panel meeting prior to BMP-2 being approved. At the time, the expert was a private physician but was later hired to be a vice president at Medtronic in 2007.

f. Medtronic documents show the company successfully attempted to adopt weaker safety rules for a clinical trial studying BMP-2 in the cervical spine that would have allowed the company to continue the trial in the event that patients experienced severe swelling in the neck.

## VIII. YODA STUDY

193. In response to the various controversies surrounding BMP-2/Infuse, including a June 2011 article in the journal *Spine,* the Yale University Open Data Access (YODA) team reached an agreement for Medtronic to provide full individual participant data from all their trials of rhBMP-2 and allow unrestricted independent re-analysis of this data.

194. The YODA study involved research teams at two universities – the University of York and the Oregon Health and Science University.

195. The review focused exclusively on the use of rhBMP-2 in patients undergoing spinal fusion surgery for treatment of degenerative disc disease, spondylolisthesis, or any other relevant spinal condition.

196.    The three main objectives of the study were: 1) to examine the potential benefits of BMP-2, 2) to examine the potential harms of BMP-2, and 3) to assess the reliability of the published evidence base.

197.    Medtronic submitted data from 17 studies, including 12 randomized controlled trials (RCTs).

198.    In total, the YODA study analyzed the data from 1,409 participants.

199.    Though the results showed moderate success with fusions as a result of BMP-2, the study found that BMP-2 results in several different complications including: arthritis, implant-related events, retrograde ejaculation, wound complications, and neurological, urogenital, and vascular events.

200.    In regard to the alleged tampering with the peer-reviewed studies by Medtronic, the YODA study found that only two out of twenty peer-reviewed journal publications reported a comprehensive list of all adverse events that occurred during the studies.

201.    Furthermore, the way in which adverse event data was presented in the literature was inconsistent, and the rationale for presenting some adverse events but not others was rarely clear.

202.    The study concluded that for the period up to 24 months after surgery, treatment with BMP-2 increases the probability of successful fusion (according to Medtronic definitions and reports, which the study noted "were subjective so it is not possible to confirm whether reported successful fusions truly were successful" see YODA Study, p. 35) but this does not translate to clinically meaningful benefits in pain reduction, function, or quality of life. The small benefits in these outcomes observed from six months onward come at the expense of more pain in the immediate post-operative period and a possible increased risk of cancer.

203. Even more relevant to the case against Dr. Durrani and the Hospitals is the YODA study's conclusion that, "[i]t is very important that these findings are expressed clearly and discussed with patients so that they can make informed choices about the type of surgery they would prefer." *Id.*

204. The University of Oregon Study determined that Infuse/BMP-2 is not better than Autograft, while the University of York study determined that Infuse/BMP-2 offers only a slight and not statistically significant advantage over Autograft.

205. The YODA study concluded that Medtronic "misrepresented the effectiveness and harms through selective reporting, duplicate publication, and underreporting."

206. Adverse event categories such as heterotopic bone formation, osteolysis, and radiculitis were not included in participant databases or internal reports; therefore, the safety profile was not fully assessed.

207. The YODA study further concluded that Medtronic was involved in drafting, editing, and shaping the content of medical journal articles on Infuse/BMP-2 authored by its physician consultants who received significant amounts of money through royalties and consulting fees from Medtronic. The company's significant role in authoring or substantively editing these articles was not disclosed in the published articles.

208. Medtronic paid a total of approximately $210 million to the physician authors of Medtronic-sponsored studies on Infuse from November 1996 through 2010 for consulting, royalty and other arrangements.

209. An email exchange showed that a Medtronic employee recommended against publishing a complete list of adverse events or side effects possibly associated with Infuse in a 2005 *Journal of Bone and Joint Surgery* article.

210.    Medtronic officials inserted language into studies that promoted Infuse as a better technique than an alternative procedure by overemphasizing the pain associated with the alternative procedure.

211.    Medtronic's actions violated the trust patients have in their medical care. Medical journal articles should convey an accurate picture of the risks and benefits of drugs and medical devices, but patients are at serious risk when companies distort the facts the way Medtronic has. See United States Senate Committee on Finance, October 2012.

212.    Infuse was intended for a single level anterior lumbar interbody fusion performed with all three components in a specific spinal region. The three components are a tapered metallic spinal fusion cage (NOT PLASTIC), a recombinant human (BMP) bone Morphogenetic Protein, and a carrier/scaffold for the BMP and resulting bone. The Infuse product is inserted into the LT-CAGE Lumbar tapered Fusion Device component to form the complete Infuse Bone Graft/LT-Cage Lumbar Tapered Fusion Device. These components must be used as a system. The Infuse Bone Graft component must not be uses without the LT-Cage Lumbar Tapered Fusion Device component.

213.    BMP-2 is not supposed to be used in minors.

214.    BMP-2 is not supposed to be used with smokers and diabetics because of vascular slowing.

215.    BMP-2 should not be used with women in child bearing years.

216.    BMP-2 is contraindicated for patients with a known hypersensitivity to rhBMP-2 and should not be used in the vicinity of a resected or extant tumor, in patients with active malignancy, or in patients undergoing treatment for a malignancy.

## IX.  DR. DURRANI AND BMP-2

217.   Despite all of these warning signs, Dr. Durrani, with the full knowledge of the Defendants, continued to use BMP-2 in ways not approved by the FDA, or in an "off-label" manner.

218.   As early as 2007, Dr. Durrani and UC Health knew there were issues with BMP-2 because insurance companies such as Anthem were refusing to pay for BMP-2.

219.   Medtronic provided in writing to Dr. Durrani and CAST the approved uses for Infuse/BMP-2.

220.   However, Dr. Durrani and the Defendants continued to use BMP-2 in off-label ways, including but not limited to:

      a.   Using BMP-2/Infuse in children, despite Medtronic specifically requiring it be used only in "skeletally mature patients;"

      b.   Using it outside the L2-S1 level of the spine;

      c.   Ignoring the requirement that BMP-2/Infuse only be used for Grade 1 spondylolisthesis or Grade 1 retrolisthesis;

      d.   Not requiring at least six months of non-operative treatment prior to the use of BMP-2/Infuse;

      e.   Using BMP-2/Infuse without the required cage;

      f.   Not using the "carrier scaffold" in conjunction with BMP-2/Infuse as required;

      g.   Using BMP-2/Infuse without proper training despite Medtronic's warning, "Caution: Federal (USA) law restricts this device to sale by or on the order of a physician with appropriate training or experience."

221.   Dr. Durrani was a paid consultant for Medtronic.

222.    According to Dr. Durrani's own deposition testimony in several cases, Medtronic required one of their representatives to be present in the operating room when its product BMP-2/Infuse is used.

223.    Because Medtronic representatives were present in these surgeries, Medtronic knew when Dr. Durrani used BMP-2/Infuse outside the approved uses according to Medtronic's own guidelines.

224.    Dr. Durrani was encouraged by Medtronic to obtain peer review and published studies from Medtronic sales representatives to support his use of BMP-2/Infuse.

225.    Dr. Durrani was encouraged by Medtronic to be an advocate for his patients and describe how BMP-2/Infuse technology can benefit them.

226.    When asked how he got his Medtronic grant, Dr. Durrani responded, "You apply to the Medtronic's corporate and say this is what we want to do, like everybody else in the country applies, and then they come and evaluate the thing and say, "Okay, we think it's worthy. We'll give you the grant."

227.    In regard to his role as a Medtronic consultant, Dr. Durrani stated, "If there are certain products that they help us in developing, then they will come to us for a certain consultant role for a certain product development."

228.    Dr. Durrani also stated, "I was involved in the development of the minimally invasive spine instrumentation."

229.    Dr. Durrani gave conflicting reports on his financial relationship with Medtronic.

230.    In a deposition, when asked when his relationship with Medtronic began, Dr. Durrani responded "2000-it's 2003, '04. Something in that category. I'm not sure. It's on the Medtronic website. You can go look at it."

231.    Medtronic's website has no information regarding their relationship with Dr. Durrani.

232.    In another deposition, Dr. Durrani stated he began his relationship with Medtronic in "2005 or '06."

233.    Dr. Durrani also gave conflicting reports on how much compensation he received from Medtronic for his consultation services.

234.    In one deposition, Dr. Durrani stated in response to an inquiry as to how much payment he received, "It's a standard compensation. Again, it's on the website, how much they've paid us."

235.    Again, this information is not available on the Medtronic website.

236.    In another deposition, when asked if he received income from Medtronic, Dr. Durrani replied, "No, I don't."

237.    When questioned further if he received a fee as a consultant, he stated, "If you do a work, there is a contractual obligation that they have to pay you. As I told you in my last deposition, they did declare it on their website, so you can actually go on the website and see how much they paid."

238.    In another deposition, Dr. Durrani stated that he received, "less than $10,000 in ten years" from Medtronic.

239.    An email dated July 30, 2008 from Medtronic Senior Product Manager Katie Stamps to Dr. Durrani states that she "is in the process of working on the renewal of your [Dr. Durrani's] consulting agreement." As stated, this information is not available on Medtronic's website, nor is any information relating to Dr. Durrani's role as a consultant for Medtronic.

240. A CCHMC packet relating to its Orthopedics department indicated that Dr. Durrani received $60,000 in grants, contracts, or industry agreements from Medtronic Sofamor Danek in FY 2008.

241. Financial information discovered concerning Dr. Durrani's relationship with Medtronic was found in Dr. Durrani's biography on the website for the Orthopaedic & Spine Institute, which Dr. Durrani currently operates in Pakistan. The biography states that "Dr. Atiq Dr. Durrani has also received the Clinical Spine Fellowship Grant by the Department of Orthopaedic Surgery which was funded by Medtronic Sofamor Danek with a budget of $59,170 per year." See http://www.osi.com.pk/doctor/dr-atiq-Dr. Durrani-md/.

242. When a request was made to Medtronic regarding its affiliation with Dr. Durrani, the Medtronic Supplier Relations Team stated that Dr. Durrani's "name [is] not listed in our system."

243. Medtronic further responded to the Deters Law Firm's request that the firm would need a "Vendor I.D. Number," which neither Medtronic nor any other party has provided.

244. David Rattigan, was Dr. Durrani's main Medtronic representative from Bahler Medical.

245. David Rattigan and Medtronic have the same lawyer. Despite the Deters Law Firm's willingness to cooperate in scheduling the date for a deposition, they have refused until recently. Mr. Rattigan's deposition was taken June 5, 2015.

246. In summary, clients of the Deters Law Firm, with the full knowledge and intentional consent of all Defendants, became unsuspecting experiments for real world testing of Medtronic hardware and BMP-2, by and through Dr. Durrani and CAST, who had secret financial connections to Medtronic, improper motives, and submitted false claims. The government paid

for many of these improper and unregulated experiments as a result of the false claims made by Dr. Durrani, with the knowledge of Medtronic, under the veil of "medically necessary" surgeries.

247.    Despite repeated requests, Medtronic has refused to cooperate in providing any requested information and is actively downplaying their connections to Dr. Durrani.

## X.    THE DEFENDANTS AND BMP-2

248.    The purpose of the background information on the following Defendants and BMP-2 concerning other hospitals is to show the egregious methods, which upon information and belief were used at all hospitals.

249.    The Defendants allowed and encouraged these practices by Dr. Durrani for the sole purpose of money and greed.

250.    David Rattigan was always present in Dr. Durrani's operating rooms as a representative of Medtronic.

251.    David Rattigan's sole job was to deliver the BMP-2/Infuse to the Hospitals and make sure that it was inserted correctly into the patient.

252.    David Rattigan's presence in the OR further supports the Defendants awareness of Dr. Durrani's fraudulent use of BMP-2/Infuse.

253.    **Informed Consent for Surgical or Medical Procedure and Sedation:**

It is the responsibly of the attending physician to obtain informed consent prior to the procedure. The patient, or his/her representative, will be advised by his/her physician of:

    a.    The explanation of the procedure

    b.    The benefits of the procedure

    c.    The potential problems that might occur during recuperation

    d.    The risks and side effects of the procedure which could include but are not limited to severe blood loss, infection, stroke or death.

  e.  The benefits, risks and side effect of alternative procedures including the consequences of declining this procedure or any alternative procedures.

  f.  The likelihood of achieving satisfactory results

Completion of the "Consent to Hospital and Medical Treatment" form to examine and treat is NOT sufficient as consent to perform a surgical procedure, invasive procedure, or for medical regimens of substantial risk or that are the subject of human investigation or research.

254. The Defendants had the responsibility to carry out these consent rules.

255. Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries.

256. BMP-2 is manufactured, marketed, sold and distributed by Defendant Medtronic under the trade name "Infuse."

257. Dr. Durrani is a consultant for Medtronic.

258. Defendants did not inform Plaintiffs of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

259. Medtronic, provided in writing to Dr. Durrani the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

260. BMP-2 is not approved by the Food and Drug Administration for use in the cervical and thoracic spine.

261. BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

262. For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in

conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device
Component ("LT-CAGE")

263.    Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side
(lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using
components other than or in addition to the LT-CAGE is not approved by the FDA, and thus
such procedures and/or use of non-FDA approved componentry is termed "off-label."

264.    When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to
as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are
compressed by such excessive bone growth, a patient can experience, among other adverse
events, intractable pain, paralysis, spasms, and cramps in limbs.

265.    The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer
four (4) times greater than other bone graft alternatives.

266.    Dr. Durrani and Children's Hospital personnel did not disclose to Plaintiffs their intent to
use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not
approved by the FDA.

267.    Dr. Durrani used BMP-2 in Plaintiff in a manner not approved by Medtronic or the FDA.

268.    Defendants did not inform Plaintiffs that Dr. Durrani used Infuse/BMP-2 in his surgeries.

269.    Plaintiffs would not have allowed BMP-2 to be used by Dr. Durrani in his surgery in a
manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

270.    Plaintiffs would not have consented to the use of BMP-2 in Plaintiff's body if informed
of the risks by Dr. Durrani or any Children's Hospital personnel.

271.    The written informed consent of Dr. Durrani signed by Plaintiffs lacked the disclosure of
Infuse/BMP-2's use in his procedures.

272.    Plaintiffs never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani or any Children's Hospital personnel.

273.    Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

274.    Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

275.    Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

276.    Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

277.    Dr. Durrani regularly used BMP-2 without a proper LT cage in his surgeries.

### INFUSE/BMP-2

278.    Dr. Durrani oftentimes used BMP-2 "off-label" when performing surgeries.

279.    BMP-2 is manufactured, marketed, sold and distributed by Defendant Medtronic under the trade name "Infuse."

280.    Dr. Durrani is a consultant for Medtronic.

281.    Defendants did not inform Plaintiffs of Durrani's financial interest, conflicts of interest or consulting arrangement with Medtronic.

282.    Medtronic, provided in writing to Dr. Durrani and CAST the approved uses for BMP-2, the substance also referred to as Infuse, which is a bone morphogenic protein, used as an artificial substitute for bone grafting in spine surgeries.

283.    BMP-2 is not approved by the Food and Drug Administration for use in the cervical and thoracic spine.

284.    BMP-2 is neither safe nor approved for use on children less than twenty one (21) years of age.

285.    For use in spinal surgery, BMP-2/Infuse is approved by the FDA for a limited procedure, performed on a limited area of the spine, using specific components. Specifically, the FDA approved Infuse for one procedure of the spine: Anterior Lumbar Interbody Fusion ("ALIF" or "Anterior" approach); and only in one area of the spine: L4 to S1; and only when used in conjunction with FDA-Approved Components: LT-CAGE Lumbar Tapered Fusion Device Component ("LT-CAGE").

286.    Use of Infuse in cervical or thoracic surgery, or use through the back (posterior), or side (lateral), or on areas of the spine outside of the L4-S1 region (e.g., the cervical spine), or using components other than or in addition to the LT-CAGE is not approved by the FDA, and thus such procedures and/or use of non-FDA approved componentry is termed "off-label."

287.    When used off-label, Infuse frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord. When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

288.    The product packaging for BMP-2/Infuse indicates it causes an increased risk of cancer four (4) times greater than other bone graft alternatives.

289.    Dr. Durrani, CAST staff and employees, and West Chester/UC Health personnel did not disclose to Plaintiffs their intent to use BMP-2/Infuse, and further, did not disclose their intent to use BMP-2/Infuse in a way not approved by the FDA.

290.    Dr. Durrani used BMP-2 in Plaintiff in manners not approved by Medtronic or the FDA.

291.    Plaintiff was not informed by Defendants that Dr. Durrani used Infuse/BMP-2 in her surgery.

292.    Plaintiff would not have allowed BMP-2 to be used by Dr. Durrani in her surgery in a manner that was not approved by the FDA or Medtronic, Infuse/BMP-2's manufacturer.

293.    Plaintiff would not have consented to the use of BMP-2 in her body if informed of the risks by Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

294.    The written informed consent of Dr. Durrani, CAST, and West Chester/UC Health signed by Plaintiff lacked the disclosure of Infuse/BMP-2's use in her procedure.

295.    Plaintiff never received a verbal disclosure of Infuse/BMP-2 from Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

296.    Medtronic specifically required Infuse/BMP-2 only be used in "skeletally mature patients" with degenerative disc disease.

297.    Medtronic required at least six (6) months of non-operative treatment prior to use of Infuse/BMP-2.

298.    Dr. Durrani regularly used Infuse/BMP-2 without this six (6) month non-operative treatment.

299.    Medtronic required BMP-2 always be used in conjunction with a metal LT cage.

300.    Dr. Durrani regularly used BMP-2 without a proper LT cage in her surgeries

### PUREGEN

### PUREGEN BACKGROUND

301.    PureGen Osteoprogenitor Cell Allograft (PureGen) is a highly concentrated, pure population of Early Lineage Adult (ELA) stem cells that originates in bone marrow and is collected from live, healthy donors.

302.    PureGen is harvested from living human beings under the Stem Cell Collection Program administered by the Food and Drug Administration (FDA) and is defined as both a "biologic" by 42 U.S.C. 351(i) and a "drug" as defined by U.S.C. 321(g).

303.    PureGen's purpose was to facilitate bone fusion by mimicking the regenerative environment of youthful tissues by increasing the concentration of stem cells available to repair tissue and build bone.

304.    When used off-label, as Dr. Durrani often did, biologic bone allograft frequently causes excessive or uncontrolled (also referred to as "ectopic" or "exuberant") bone growth on or around the spinal cord.

305.    When nerves are compressed by such excessive bone growth, a patient can experience, among other adverse events, intractable pain, paralysis, spasms, and cramps in limbs.

306.    Alphatec Spine, Inc. is a corporation under the laws of California, and jointly developed and distributed PureGen in the State of Ohio.

307.    Alphatec Holdings, Inc. is a holding corporation formed under the laws of Delaware with no operations separate from the holding of other companies which owns Alphatec Spine, Inc.

308.    Dirk Kuyper was President and CEO of Alphatec Holdings, Inc. from February 2007 to August 2012.

309.    Parcell Laboratories, LLC is organized under the laws of Delaware and jointly developed Puregen.

310.    Alphatec and Parcell co-developed the product "PureGen", and both expected PureGen would be initially limited in application.

311.    PureGen is produced and distributed by Alphatec Spine, LLC, a division of Alphatec Holdings.

312.    PureGen was entered into 3 clinical trials by Alphatec on or around February 9, 2011 which were scheduled to last until September of 2013.

313.    The study population were 50 male/female subjects 18 years and older suffering from symptoms of cervical degenerative disc disease in one to four contiguous levels between C3 and T1.

314.    The clinical trial required:

    a.    Inclusion

        i.    Age over 50

        ii.    Side-by-side use of Puregen and Autologous bone in the same patient for radiographic comparison

        iii.    Symptomatic lumbar degenerative disc disease in up to 2 contiguous levels between L1 and S1

        iv.    Subjects with back and/or leg paint indicated for posterior stabilization with or without decompression at any level and posteriolateral fusion

        v.    Unresponsive to conservative treatment for at least 6 months

        vi.    Radiographic evidence of primary diagnosis

    b.    Exclusion:

        vii.    No healthy volunteers permitted

        viii.    More than two levels requiring posteriolateral fusion (PLF)

        ix.    Spondyliosis greater than Grade 1

        x.    Prior failed fusion surgery at lumbar level(s)

        xi.    Systemic or local infection in the disc or cervical spine, past or present

        xii.    Active systemic disease

xiii. Osteoporosis, Osteomalacia, or other metabolic bone disease that would significantly inhibit bone healing

xiv. Use of other bone graft, Bone Morphogenic Protein (BMP), or bone graft substitutes in addition to or in place of those products specified

xv. BMI greater than 40

xvi. Use of post-operative spinal cord stimulator

xvii. Known or suspected history of alcohol and/or drug abuse

xviii. Involved in pending litigation or worker's compensation related to the spine

xix. Pregnant or planning to become pregnant during the course of the study

xx. Insulin-dependent diabetes mellitus

xxi. Life expectancy less than duration of study

xxii. Any significant psychological disturbance that could impair consent process or ability to complete self-assessment questionnaires

xxiii. Undergoing chemotherapy or radiation treatment, or chronic use of oral or injected steroids or prolonged use of non-steroidal anti-inflammatory drugs

xxiv. Known history of hypersensitivity or anaphylactic reaction to dimenthyl sulfoxide (DMSO).

315. All 3 clinical trials were "Terminated" before any results were produced.

316. Alphatec and Parcell saw this limited approval for clinical trials as an opportunity to market PureGen without premarket approval, 510K clearance, an exception to the Food Drug

and Cosmetic Act, meeting the humanitarian device exception, investigational new drug (IND) application, or other permission to market PureGen, all in violation of the Food Drug and Cosmetic Act.

317. Alphatec and Parcell began a course of conduct designed to expand the application of PureGen by end users in excess of the approved clinical trial of PureGen. This course of conduct utilized fraud, false statements, material misrepresentation, and deceit in order to broaden the sales of PureGen beyond that which the usual acceptance within the scientific community or regulatory approval would otherwise allow.

318. The Food and Drug Administration (FDA) conducted an inspection of Parcell Laboratories between February 9-14, 2011.

319. After the inspection, the FDA responded quickly to the unlicensed marketing of the device PureGen by warning that PureGen was not the subject of an IND application nor a valid biologics license with a letter dated June 23, 2011.

320. The letter stated that the cells used in the production of PureGen were human cells, tissues, or cellular and tissue-based products (HCT/Ps) as defined in 21 CFR 1271.3(d).

321. Based on this analysis, the FDA determined that PureGen was a drug and biological product as defined in the Federal Food, Drug and Cosmetic Act.

322. According to the Public Health Service Act, a valid biologics license is also required to introduce a biologics device to the market.

323. Alphatec Spine did not acquire a valid biologics license to enter a biologics product into interstate commerce, in violation of 21 U.S.C. 355(a); 42 U.S.C. 262(a).

324. The FDA stated that PureGen, "does not meet all of the criteria in 21 CFR 1271.10(a) and therefore is not regulated solely under section 361 of the Public Health Service Act and the

regulations in 21 CFR Part 1271. Specifically, the product does not meet the criterion in 21 CFR 1271.10(a)(4)(ii)(b) because the product is dependent on the metabolic activity of living cells for its primary function."

325.    As a result, a valid biologics license was required, which was never obtained by Alphatec or Parcell labs in regards to PureGen.  Defendants knew all this.

326.    Given this lack of a valid biologics license, the FDA determined that the marketing of PureGen violated both the Federal Food, Drug and Cosmetic Act and the Public Health Service Act.

327.    In a statement to the press approximately a week after receiving the FDA Letter, Alphatec President Dirk Kuyper stated, "Both Alphatec Spine and Parcell Laboratories are fully committed to work closely and collaboratively with the FDA to address the questions related to the PureGen Product. We look forward to discussing the PureGen product with the FDA and sharing our clinical outcomes to date." See article "Alphatec comments on FDA's letter regarding PureGen product for spinal fusion procedures", Spinal News International, July 28, 2011.

328.    No such cooperation by Alphatec and Parcell labs occurred and no clinical outcomes were shared with the FDA as all clinical trials of PureGen were "Terminated" and no data was released as to the findings.

329.    In fact, Alphatec and Parcell responded to this letter by continuing to market PureGen in an unlicensed manner until Alphatec finally acknowledged the letter in or around February 2013, almost two years after receiving the letter, by stating it disagrees with the FDA's classification of PureGen as anything other than a tissue product – despite the clinical trial approval listing PureGen as "Biological: PureGen Osteoprogenitor Cell Allograft".

330.    Furthermore, according to sales representative, Thomas Blank, Alphatec falsely informed distributors of PureGen that they "resolved" the issues addressed in the FDA letter, did not have to take PureGen off the market and it was "ok" for their distributors to continue marketing and selling PureGen.

331.    Despite the approval for the clinical trial of PureGen which limited enrollment to 50 patients, Alphatec advertised in its 2012 Annual Report that PureGen had been implanted in over 3,500 patients.

332.    PureGen further stated that it had been placed in these 3,500 patients with "no adverse events related to the product", despite no study, statistics or information to back up such a claim.

333.    This 2012 annual report also identified PureGen as a biologic.

334.    In the First Quarter of 2011, Alphatec Spine attributed part of its 40.9% increase in revenue to the PureGen product. See Becker's Spine Review, Alphatec Spine Reports $49.7M in Q1 Revenue, 40.9% Increase, May 5, 2011, attached as exhibit H.

335.    Eventually, after PureGen had been unlawfully implanted in thousands of patients, Alphatec and Parcell conceded that PureGen is a tissue product and a biologic and stopped shipping PureGen in February of 2013.

## PUREGEN AND OHIO LAW

336.    It is the position of the Deters Law Firm that the distribution and use of PureGen by Dr. Durrani, Evolution Medical, Alphatec Spine, Inc., and West Chester/UC Health by Defendants is in violation not only of Federal Law as outlined in the FDA's letter, but Ohio State Law as well.

337.    Ohio Revised Code 3715.65(A) states that "No person shall sell, deliver, offer for sale, hold for sale, or give away any new drug unless an application with respect to the drug has

become effective under section 505 of the Federal Food, Drug and Cosmetic Act, 52 Stat. 1040 (1938), 21 U.S.C.A. 301". Defendants violated this provision.

338. A "New Drug" is defined as "Any drug the composition of which is not generally recognized among experts by scientific training and experience to evaluate the safety of drugs, as safe for use under the conditions prescribed, recommended, or suggested in the labeling thereof." Ohio Revised Code 3715.01(9)(a).

339. PureGen's status as a Biologic further supports the classification of a drug under the FDA and Ohio Law: "A "biological product" means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings (Public Health Service Act Sec. 351(i)). Additional interpretation of the statutory language is found in 21 CFR 600.3. Biological products also meet the definition of either a drug or device under Sections 201(g) and (h) of the Federal Food, Drug, and Cosmetic Act (FD&C Act)." See http://www.fda.gov/ICECI/Inspections/IOM/ucm122535.htm.

340. It is the position of the Deters Law Firm that PureGen is a drug as defined in ORC 3715.01 and that its distribution before FDA approval was in violation of ORC 3715.65(A). The Defendants with full knowledge and intent violated this statute.

**PUREGEN AT THE HOSPITALS**

341. On October 10, 2011, UC Health began purchasing PureGen from Alphatec. Thomas Blank was an employee of Innovative Medical Consultants, LLC and a sales representative, seller, marketer, and distributer of PureGen for the Northern Kentucky/Cincinnati area.

342.    In his professional capacity, Thomas Blank was present during most, if not all, of the surgeries at issue where PureGen was secretly implanted into various Plaintiffs without informed consent or permission.

343.    Thomas Blank worked directly with Alphatec Spine, Inc. and Defendants in the marketing and distribution of PureGen.

344.    Additionally, Thomas Blank is a shareholder in Alphatec Spine, Inc.

345.    On May 10, 2012 Evolution Medical, LLC, a physician owned distributorship (POD), owned in part (at least 40%) by Dr. Durrani and incorporated in Delaware, received a Kentucky Certificate of Authority.

346.    Around this time, Thomas Blank began to work with Evolution Medical in the marketing and distribution of PureGen, in addition to his dealing with Alphatec Spine, Inc.

347.    On July 20, 2012, UC Health with the full knowledge and consent of Defendants began purchasing PureGen from Evolution Medical, LLC.

348.    The purchase of PureGen, the logistics of the billing, the bills of lading, the receiving and handling of PureGen for West Chester Hospital was handled by UC Health Purchasing.

349.    The Defendants tracked West Chester/UC Health's purchases of PureGen from Evolution medical.

350.    Specifically, Thomas Blank would provide the materials from Alphatec related to the use and approval of PureGen to Dwayne Brown on behalf of UC Health, who would request PureGen based on the amounts requested by Dr. Durrani and other doctors who used the product.

351.    After the UC Health reps approved the use of PureGen, Thomas Blank and his associate Toby Wilcox would order the product, typically in bulk, and draft the requisite billing documents.

352. The PureGen ordered would be stored on site at WCH in the freezer of the operating rooms.

353. In addition to Dr. Durrani, other doctors at WCH used PureGen, including Dr. Chunduri, Dr. Curt and Dr. Shanti.

354. Defendants would purchase and allow these doctors to use a substance not approved by the FDA in patients without their informed consent.

355. Though WCH and UC Health do have patients fill out "informed consent" forms, no mention of PureGen or its non-FDA approved status is mentioned on these forms.

**DR. DURRANI AND PUREGEN**

356. In one of the few depositions taken of Dr. Durrani before his flight from the country he stated that PureGen is "essentially stem cells" and that he "used to use [PureGen] for a certain amount of time." Deposition of Dr. Durrani in *Brenda Shell v. Durrani*, p. 25-26, attached as Exhibit N.

357. This "certain amount of time" was approximately 3 years between 2010 and 2013, all while PureGen remained unapproved by the FDA.

358. Though downplaying his involvement with PureGen, Dr. Durrani, through his illegal POD Evolution Medical, distributed PureGen to West Chester/UC Health with the full knowledge and consent of Defendants.

359. Dr. Durrani and his Evolution Medical co-owner Toby Wilcox and Defendants, knew the Department of Health and Human Services and the United States Senate Finance Committee has released reports on dangers of Physician-owned entities, notably Physician-owned Distributorships (POD's).

360. Dr. Durrani and Toby Wilcox's actions through Evolution Medical violated the Anti-Kickback Statute 42 U.S.C. 1320 and Stark Law 42 U.S.C. 1395.

361. Compliance with the Anti-Kickback Statutes is a condition of receiving payment from a Federally-funded healthcare program, and most private insurers have a parallel conditional requirement.

362. The Anti-Kickback Statute prohibits the payment and receipt of kickbacks in return for either procuring or recommending the procurement of a good, facility, or item to be paid in whole or in part by a federal healthcare program. 42 U.S.C. 1320a-7b(b).

363. In violation of 45 C.F.R. 46, and in furtherance of the scheme to feign avoidance of the anti-kickback statutes, Dr. Durrani, CAST, Alphatec and the Defendants experimented on patients by using PureGen in unapproved manners, without the informed consent of the patients, and subsequently billing their health insurance companies all while concealing the true nature of their actions.

364. Dr. Durrani also had connections with Alphatec as his personal calendar indicates meetings with Dirk Kuyper, President and CEO of Alphatec in 2008.

365. Dr. Durrani experimentally used Puregen bone graft in twenty cervical surgeries, along with as many as 72 thoracic, cervical, and lumbar surgeries, ignoring the limited uses it was approved for in the clinical trials.

366. Dr. Durrani, through his POD Evolution Medical, was essentially "double dipping" in his dealings with PureGen.

367. Dr. Durrani would sell WCH and the other hospitals the PureGen through Evolution Medical and then use and bill for the PureGen in his surgeries.

368. Dr. Durrani and Defendants knew such an arrangement was either unethical and illegal (though still not disclosing the use of PureGen) by having the patients sign an Acknowledgement of Potential Conflict of Interest form.

369. WCH and Defendant also benefited from this arrangement by up charging patients for the PureGen after purchasing it from Evolution Medical and Dr. Durrani.

370. At all times relevant, Dr. Durrani and Defendants was in exclusive control of the amount and ratio of Puregen bone graft that was experimentally implanted into patients.

371. PureGen was and remains unapproved by the FDA for use in humans without an Investigation New Drug ("IND") or experimental informed consent of the patient.

372. Dr. Durrani and Defendants did not receive experimental informed consent from patients, nor did he verify that an IND was obtained.

373. The basic "Informed Consent Forms" Dr. Durrani and CAST did have patients fill out made no mention of PureGen or the fact a non-FDA approved product was being implanted in their body.

374. In fact, Dr. Durrani and Defendants would even conceal the use of PureGen by intentionally withholding it from the billing records, noting on one Pre-Op Code sheet "Do Not Bill" twice in regards to PureGen.

375. Implanting Puregen in any part of the spinal canal without FDA clearance, proper trials, and patient consent is reckless battery and violates the Hippocratic Oath's statement "I will prescribe regimens for the good of my patients according to my ability and my judgment and never **do harm** to anyone." It is criminal.

## PUREGEN AND OUR CLIENTS

376. What follows are just a few examples of the damage caused Dr. Durrani and the Defendants deceptive and fraudulent use of PureGen in Deters Law Office clients without their consent.

377. A majority of these surgeries occurred AFTER the FDA inspection and subsequent warning on the non-FDA approved status of PureGen.

378. Following the cervical surgeries in which Puregen was implanted, the patients' pain became far worse and more extreme.

379. The patients attest to difficulty with swallowing unthickened liquid, medications in pill form, routine saliva, and food.

380. Many patients describe a choking sensation felt on a daily basis when swallowing and changes to the tone and audibility of their voice, along with a chronic cough.

381. Following the thoracic and lumbar surgeries, patients attest to increased spinal pain, difficulty with ambulation, numbness and tingling in lower extremities, decreased flexibility.

382. Below are some of the clients experiences since having the Puregen implanted:

383. "I have severe low back pain, stiffness, decreased range of motion and tenderness. Pain radiating to left posterior thigh and right/left lumbar area. Onset months ago after surgery." – William Hayes

384. "Constant, irritating pain, less intense but still present. Even after two surgeries, I continue to have limited use of my left leg. The pain is ever-present. I am easily fatigued and have severe pain after brief tasks such as cooking dinner, preaching a sermon, even making a bed. Bending over is so painful and produces such instability that my family helps put on my

socks and shoes. I require a cane for ambulation, due to left leg weakness and limited range of motion." – Darrell Earls

385.    "Severe spin in my neck, arm, shoulder blades. Pressure on my throat making it unbearable to swallow meds and food. Loss of range of motion in my neck and stiffness in back. The pain is so severe that I can no longer sleep laying down. I have to sleep sitting up. The pain in my neck is unbearable most days. The pain runs between my shoulder blades into my chest and in my throat and side of my neck." - Duane Pelfrey

386.    "I feel I have lost a lot of the flexibility in my neck and back. I have lower back pain, tightness in neck and shoulders, and have a hard time lifting/standing for long periods of time. When I bend over, I have a hard time straightening back up to an upright position." - Dana Conley

387.    "Low back pain radiating into bilateral hips, buttocks, legs and feet. Bilateral leg weakness. Numbness in left foot and toes. Bilateral buttock and posterior thigh muscle spasms. Burning sensation in right abdomen that radiates around to back. My post-surgery MRI and CT scan showed bony overgrowth into the foramen and into the canal on left at L5-S1." - Julie Martin

388.    "I experience pounding headaches that are far worse than anything prior to surgery. Left leg is numb, painful and swollen, muscle spasms occurring in hip and bilateral legs since surgeries with Dr. Durrani. My whole back, neck and leg hurt so bad I could throw up." - Tonia McQueary

389.    "I have much more pain. Constant right-sided headache, intensity varies but always present. The back of my neck swells. My esophagus feels like it is in a different place. My throat swells." – Kelly Hennessey

390.    As stated, there are just a few examples of clients that have been discovered to have had non-FDA approved PureGen implanted into their bodies without their informed consent, in violation of both Federal and State Law, all with the knowledge of Defendants.

## PUREGEN

391.    Dr. Durrani oftentimes used Puregen when performing surgeries.

392.    Puregen is a product produced by Alphatec Spine.

393.    Dr. Durrani was and is a paid consultant for Alphatec Spine.

394.    Dr. Durrani has an ownership stake in the Alphatec Spine.

395.    Puregen has never been approved by the FDA for any human use.

396.    Puregen is now removed from the market for any use.

397.    Dr. Durrani used the product Puregen as bone graft substitute similar to Infuse/BMP-2 during spinal surgeries.

398.    Dr. Durrani, CAST staff and employees, and West Chester/UC Health personnel did not disclose their intent to use Puregen, nor did they inform Plaintiffs that it was a product that was not approved by the FDA for human use.

399.    Dr. Durrani used Puregen in Plaintiff in manners not approved by the FDA.

400.    Plaintiffs were not informed by Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel that Dr. Durrani used Puregen in Plaintiff's surgery.

401.    Plaintiff would not have allowed Puregen to be used by Dr. Durrani in her surgery in a manner that was not approved by the FDA.

402.    Plaintiff would not have consented to the use of Puregen in her body if informed of the risks by Dr. Durrani, CAST staff and employees, or any West Chester/UC Health personnel.

403.    The written informed consent of Dr. Durrani and CAST signed by Plaintiff lacked the disclosure of Puregen's use in her procedure.

404.    Plaintiff never received a verbal disclosure of Puregen from Dr. Durrani, CAST staff and employees, or any West Chester/UC Health Personnel.

## DR. DURRANI COUNTS:

### COUNT I: NEGLIGENCE

405.    Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

406.    Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, and improper follow-up care addressing a patient's concerns.

407.    As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

### COUNT II: BATTERY

408.    Dr. Durrani committed battery against Plaintiff by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2, PureGen and/or Baxano in ways and for

surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

409. Plaintiff would not have agreed to the surgeries if they knew the surgeries was/were unnecessary, not approved by the FDA, and not indicated.

410. As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: LACK OF INFORMED CONSENT

411. The informed consent forms from Dr. Durrani and CAST which they required Plaintiff to sign failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani. Dr. Durrani and CAST each required an informed consent release.

412. In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before Plaintiff's surgery.

413. Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with her surgeries and procedures.

414. Had Plaintiff been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgery or procedures.

415. As a direct and proximate result of the lack of informed consent, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

416. Dr. Durrani's conduct as described above was intentional and reckless.

417. It is outrageous and offends against the generally accepted standards of morality.

418.     It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

419.     Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

### COUNT V: FRAUD

420.     Dr. Durrani made material, false representations to Plaintiff and their insurance company related to Plaintiff's treatment including: stating the surgeries were necessary, that Dr. Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary and futile, that the surgery would be simple or was "no big deal", that Plaintiff would be walking normally within days after each surgery, that the procedures were medically necessary and accurately reported on the billing to the insurance company, that the surgery was successful, and that Plaintiff was medically stable and ready to be discharged.

421.     Dr. Durrani also concealed the potential use of Infuse/BMP-2 and/or Puregen in Plaintiff's surgery, as well as other information, when he had a duty to disclose to Plaintiff his planned use of the same.

422.     These misrepresentations and/or concealments were material to Plaintiff because they directly induced Plaintiff to undergo her surgery.

423.     Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

424.     Dr. Durrani made the misrepresentations before, during and after the surgeries with the intent of misleading Plaintiff and their insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance company, without which

Dr. Durrani would not have performed the surgeries, and to induce Plaintiff to undergo the surgeries without regard to medical necessity and only for the purpose of receiving payment.

425.    The misrepresentations and/or concealments were made during Plaintiff's office visits at Dr. Durrani's CAST offices.

426.    Plaintiff was justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

427.    As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgeries which were paid for in whole or in part by their insurance company, and suffered all damages as requested in the Prayer for Relief.

## COUNT VI: SPOLIATION OF EVIDENCE

428.    Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

429.    Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

430.    Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT VII: LOSS OF CONSORTIUM

431.    At all times relevant, the Plaintiffs were married.

432.    As a result of the wrongful acts and omissions of Dr. Durrani, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

433. All the aforesaid injuries and damages were caused proximately by the acts and omissions of Dr. Durrani.

## CAST COUNTS:

## COUNT I: VICARIOUS LIABILITY

434. At all times relevant, Defendant Dr. Durrani was an agent, and/or employee of CAST.

435. Dr. Durrani is in fact, the owner of CAST.

436. Defendant Dr. Durrani was performing within the scope of his employment with CAST during the care and treatment of Plaintiff.

437. Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

438. Defendant CAST is vicariously liable for the acts of Defendant Dr. Durrani alleged in this Complaint including all of the counts asserted against Dr. Durrani directly.

439. As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT HIRING, RETENTION, AND SUPERVISION

440. CAST provided Dr. Durrani, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

441. CAST and Dr. Durrani participated in experiments using BMP-2 and/or Puregen bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

442. CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling the actions of Dr. Durrani and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

443. The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

444. Such disregard for and violations of federal law represents strong evidence that CAST negligently hired, retained, and supervised Dr. Durrani.

445. As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

**COUNT III: SPOLIATION OF EVIDENCE**

446. CAST, through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

447. CAST, through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

448. CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

**COUNT III: FRAUD**

449. CAST sent out billing to Plaintiff at her home following her surgery at West Chester Hospital/UC Health.

450. The exact dates these medical bills were sent out are reflected in those medical bills.

451. These bills constituted affirmative representations by CAST that the charges related to Plaintiff's surgery were medically appropriate and properly documented.

452. The bills were sent with the knowledge of CAST that in fact Plaintiff's surgery was not appropriately billed and documented and that the services rendered at West Chester Hospital/UC Health associated with Dr. Durrani were not appropriate.

453. The bills sent by CAST to Plaintiff falsely represented that Plaintiff's surgery was appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

454. Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for CAST's services in association with Dr. Durrani's surgery.

455. As a direct and proximate result of this reliance on the billing of CAST, Plaintiff incurred medical bills that she otherwise would not have incurred.

456. CAST also either concealed from Plaintiff that they knew about Dr. Durrani, including that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's surgery, or misrepresented to Plaintiff the nature of the surgery, and the particular risks that were involved therein.

457. CAST's concealments and misrepresentations regarding Infuse/BMP-2 and/or Puregen and the nature and risks of Plaintiff's surgery were material facts.

458. Because of its superior position and professional role as a medical service provider, CAST had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

459.    CAST intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgery and procedure Dr. Durrani performed on Plaintiff at West Chester Hospital/UC Health.

460.    Plaintiff was unaware that BMP-2 and/or Puregen would be used in Plaintiff's surgery and therefore, was unaware of the health risks of Infuse/BMP-2 and/or Puregen's use in Plaintiff's spine.

461.    Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgery with Dr. Durrani at West Chester Hospital/UC Health.

462.    Plaintiff is still awaiting itemized billing from CAST reflecting the exact totals charged for Plaintiff's surgery.

463.    As a direct and proximate result of the fraud against plaintiff by CAST, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT VII: LOSS OF CONSORTIUM

464.    At all times relevant, the Plaintiffs were married.

465.    As a result of the wrongful acts and omissions of CAST, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

466.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of CAST.

## WEST CHESTER HOSPITAL/UC HEALTH COUNTS:

### COUNT I: NEGLIGENCE

467.     West Chester Hospital/UC Health owed their patient, Plaintiff, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

468.     West Chester Hospital/UC Health acting through its agents and employees breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, improper assistance during Plaintiff's surgeries and improper follow up care addressing a patient's concerns.

469.     The agents and employees who deviated from the standard of care include nurses, physician assistants, residents and other hospital personnel who participated in Plaintiff's surgeries.

470.     The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of West Chester Hospital/UC Health's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of West Chester Hospital/UC Health.

471.     As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of West Chester Hospital/UC Health, Plaintiff

sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, AND RETENTION

472. As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery, and fraud.

473. West Chester Hospital/UC Health negligently credentialed, supervised, and retained Dr. Durrani as a credentialed physician, violating their bylaws and JCAHO rules by:

      a.      Allowing Dr. Durrani to repeatedly violate the West Chester Hospital/UC Health bylaws with it's full knowledge of the same;

      b.      Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for and reapplied for privileges at West Chester Hospital;

      c.      Ignoring complaints about Dr. Durrani's treatment of patients reported to it by West Chester Hospital staff, doctors, Dr. Durrani's patients and by others;

      d.      Ignoring information they knew or should have known pertaining to Dr. Durrani's previous privileged time at other Cincinnati area hospitals, including Children's Hospital, University Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

474. The Safe Medical Device Act required entities such as West Chester Hospital/UC Health to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

475. As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: FRAUD

476.    West Chester Hospital/UC Health sent out billing to Plaintiff at his home following his surgeries at West Chester Hospital.

477.    The exact dates these medical bills were sent out are reflected in those medical bills.

478.    These bills constituted affirmative representations by West Chester Hospital/UC Health that the charges related to Plaintiff's surgeries were medically appropriate and properly documented.

479.    The bills were sent with the knowledge of West Chester Hospital/UC Health that in fact Plaintiff's surgeries were not appropriately billed and documented and that the services rendered at West Chester Hospital/UC Health associated with Dr. Durrani were not appropriate.

480.    The bills sent by West Chester Hospital/UC Health to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

481.    Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for West Chester Hospital/UC Health's services in association with Dr. Durrani's surgeries.

482.    As a direct and proximate result of this reliance on the billing of West Chester Hospital/UC Health, Plaintiff incurred medical bills that he otherwise would not have incurred.

483.    West Chester Hospital/UC Health also either concealed from Plaintiff facts they knew about Dr. Durrani, including that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgery, or misrepresented to Plaintiff the nature of the surgery, and the particular risks that were involved therein.

484.    West Chester Hospital/UC Health's concealments and misrepresentations regarding Infuse/BMP-2 or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

485.    West Chester Hospital billed Plaintiff for "OR ALLOGRAFTS" in the amount of $12,394.11 for Plaintiff's March 31, 2010 surgery.

486.    West Chester Hospital billed Plaintiff for "OR ALLOGRAFTS" in the amount of $2,388.91 for Plaintiff's April 29, 2011 surgery.

487.    Plaintiff is still awaiting itemized billing statements from West Chester Hospital/ UC Health regarding Plaintiff's October 28, 2009, September 17, 2010, July 13, 2011, October 17, 2011, March 11, 2013 surgeries; upon information and belief, Plaintiff believes the itemized billing will show that Infuse/BMP-2 and/or Puregen was used in Plaintiff's surgeries.

488.    Because of its superior position and professional role as a medical service provider, West Chester Hospital/UC Health had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

489.    West Chester Hospital/UC Health intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at West Chester Hospital/UC Health.

490. Plaintiff was unaware that Infuse/BMP-2 or Puregen would be used in Plaintiff's surgeries and therefore, was unaware of the health risks of Infuse/BMP-2 or Puregen's use in Plaintiff's spine.

491. Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgeries with Dr. Durrani at West Chester Hospital/UC Health.

492. As a direct and proximate result of the fraud upon Plaintiff by West Chester Hospital/UC Health, Plaintiff sustained all damages requested in the prayer for relief.

## COUNT IV: SPOLIATION OF EVIDENCE

493. West Chester Hospital/UC Health through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

494. West Chester Hospital/UC Health through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

495. West Chester Hospital/UC Health's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT V: LOSS OF CONSORTIUM

496. At all times relevant, the Plaintiffs were married.

497. As a result of the wrongful acts and omissions of West Chester Hospital/UC Health, Plaintiffs were caused to suffer, and will continue to suffer in the future, loss of consortium, loss

of society, loss of affection, loss of assistance, and loss of conjugal fellowship, all to the detriment of Plaintiffs' marital relationship.

498.    All the aforesaid injuries and damages were caused proximately by the acts and omissions of West Chester Hospital/UC Health.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests and seeks justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1.    Past medical bills;

2.    Future medical bills;

3.    Lost income and benefits;

4.    Lost future income and benefits;

5.    Loss of ability to earn income;

6.    Past pain and suffering;

7.    Future pain and suffering;

8.    Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9.    All incidental costs and expenses incurred as a result of their injuries;

10.    The damages to their credit as a result of their injuries;

11.    Loss of consortium;

12.    Punitive damages;

13.    Costs;

14.    Attorneys' fees;

15.    Interest;

16.     All property loss;

17.     All other relief to which they are entitled including O.R.C. 1345.01

Based upon 1-17 itemization of damages, the damages sought exceed the minimum jurisdictional

amount of this Court and Plaintiff seeks in excess of $25,000.

Respectfully Submitted,

Matthew Hammer (0092483)
Lindsay Boese (0091307)
*Attorneys for Plaintiff*
5247 Madison Pike
Independence, KY 41051
Phone: 513-729-1999
Fax: 513-381-4084
mhammer@ericdeters.com

## JURY DEMAND

Plaintiffs make a demand for a jury under all claims.

Matthew Hammer (0092483)
Lindsay Boese (0091307)

# UC Health

ITEMIZED BILL

4/2/2014

Page 2 of 4

P.O. Box 740117
Cincinnati, OH 45274-0117

| Patient Name - Facility | | Account Number | Admit Date | Discharge Date | Age | Gender |
|---|---|---|---|---|---|---|
| RODRIGUEZ | DEBBIE | 2195438180000 | 03/31/2010 | 04/01/2010 | 35 | F |

WEST CHESTER MEDICAL CENTER

RODRIGUEZ DEBBIE 1
745 REEVES ROAD
DRY RIDGE       KY    41035

**If you are paying by credit card**

☐ M/C   ☐ Visa   ☐ Discover   ☐ AMEX

Card Number

Signature                     Exp Date

Show Payment Amount Here    $

Return this portion with your payment

| Service Date | Rev/Tx Code | CPT Code | Activity | Transaction Amount |
|---|---|---|---|---|
| 03/31/2010 | 00258 | | SODIUM CHLORIDE 0.9% 50ML IV BAG #167091 | $76.25 |
| 03/31/2010 | 00258 | | RINGERS SOLUTION:LACTATED IVSL IV 104013 | $303.80 |
| 03/31/2010 | 00258 | | SODIUM CHLORIDE 0.9% IVSLIV 500ML 103999 | $75.35 |
| 03/31/2010 | 00258 | | Sod. Chloride 0.9% 100ml A/V | $154.10 |
| 03/31/2010 | 00270 | | SLEEVE DVT KNEE #189071 (Reprocessed) | $25.00 |
| 03/31/2010 | 00272 | | OR BITS/BURRS/BLADES | $197.45 |
| 03/31/2010 | 00272 | | OR NEEDLES/SYRINGES | $587.00 |
| 03/31/2010 | 00272 | | OR MED SURG SUPPLY | $6201.84 |
| 03/31/2010 | 00278 | | OR BONE SCREW | $753.30 |
| 03/31/2010 | 00278 | | OR WASHER/SPACER | $71.06 |
| 03/31/2010 | 00278 | | OR IMPLANT MISC | $12801.08 |
| 03/31/2010 | 00278 | | OR ALLOGRAFTS | $12394.11 |
| 03/31/2010 | 00300 | 86901 | RH | $25.00 |
| 03/31/2010 | 00300 | 86900 | ABO TYPE | $41.00 |
| 03/31/2010 | 00300 | 86850 | ANTIBODY SCREEN: EACH INCUBATION | $91.00 |
| 03/31/2010 | 00300 | 36415 | PHLEBOTOMY | $17.00 |
| 03/31/2010 | 00320 | 72100 | DIAG LS SPINE 2 OR 3 VIEWS | $530.00 |
| 03/31/2010 | 00320 | 72100 | DIAG LS SPINE 2 OR 3 VIEWS | $-265.00 |
| 03/31/2010 | 00320 | 76001 | DIAG FLOURO > 1 HOUR | $-603.00 |
| 03/31/2010 | 00320 | 76001 | DIAG FLOURO > 1 HOUR | $1206.00 |
| 03/31/2010 | 00360 | | OR - CONTR SVC - EACH ADDL MINUTE | $11325.00 |
| 03/31/2010 | 00360 | | OR - CONTR SVC - 1ST HALF HOUR | $8275.00 |
| 03/31/2010 | 00370 | | AN - COMPLEX - EACH ADDITIONAL MINUTE | $2793.50 |
| 03/31/2010 | 00370 | | AN - COMPLEX - 1ST HALF HOUR | $543.00 |
| 03/31/2010 | 00480 | 94150 | RC INCENTIVE SPIR TX | $0.00 |
| 03/31/2010 | 00480 | 94760 | RC OXIMETER SPOTCHECK ADULT | $64.00 |
| 03/31/2010 | 00710 | | SDSC-PREOP LEVEL I-OTPT AMBULATORY 1/2HR | $0.00 |
| 03/31/2010 | 00710 | | PACU - POST OP TYPE 4: EA ADDL 1/2 HOUR | $1358.00 |
| 03/31/2010 | 00710 | | PACU - POST OP TYPE 4:UP TO 1ST HOUR | $865.00 |

*Need Help?*

| Questions: | Billing Disputes | Customer Service Hours |
|---|---|---|
| pfs@uchealth.com | UC Health Attn: Billing Disputes | M-TH 8AM - 4:30PM |
| | 3200 Burnet Ave  Cincinnati, Oh 45229 | 513-585-7600 or 1-800-277-0781 |

# UC Health

| | | |
|---|---|---|
| | ITEMIZED BILL | 4/2/2014 |
| P.O. Box 740117 | | Page 2 of 4 |
| Cincinnati, OH 45274-0117 | | |

| Patient Name : Facility | Account Number | Admit Date | Discharge Date | Age | Gender |
|---|---|---|---|---|---|
| RODRIGUEZ    DEBBIE | 2202039280000 | 04/29/2011 | 04/30/2011 | 35 | F |

WEST CHESTER MEDICAL CENTER

RODRIGUEZ DEBBIE I
745 REEVES ROAD
DRY RIDGE          KY    41035

**If you are paying by credit card:**

| ☐ M/C | ☐ Visa | ☐ Discover | ☐ AMEX |
|---|---|---|---|

Card Number

Signature                    Exp Date

Show Payment Amount Here    $

Return this portion with your payment

| Service Date | Rev/Tx Code | CPT Code | Activity | Transaction Amount |
|---|---|---|---|---|
| 04/29/2011 | 00258 | | Total IV Volume (mL) | $0.00 |
| 04/29/2011 | 00270 | | SENSOR O2 ADHESIVE LAWSON #328767-70 | $21.00 |
| 04/29/2011 | 00270 | | RC OXYGEN USEAGE / DAY | $0.00 |
| 04/29/2011 | 00272 | | OR BITS/BURRS/BLADES | $197.45 |
| 04/29/2011 | 00278 | | OR ALLOGRAFTS | $2388.91 |
| 04/29/2011 | 00278 | | OR IMPLANT MISC | $4141.80 |
| 04/29/2011 | 00278 | | OR SPINAL CAGE | $5400.00 |
| 04/29/2011 | 00278 | | OR SPINAL SCREW | $1215.00 |
| 04/29/2011 | 00320 | 72040 | DIAG C SPINE 2 OR 3 VIEWS | $298.00 |
| 04/29/2011 | 00320 | 76000 | DIAG FLOURO UP TO 1 HOUR | $530.00 |
| 04/29/2011 | 00360 | | OR - CONTR SVC - 1ST HALF HOUR | $8978.00 |
| 04/29/2011 | 00360 | | OR - CONTR SVC - EACH ADDL MINUTE | $7140.00 |
| 04/29/2011 | 00370 | | AN - COMPLEX - EACH ADDITIONAL MINUTE | $1700.00 |
| 04/29/2011 | 00370 | | AN - COMPLEX - 1ST HALF HOUR | $588.00 |
| 04/29/2011 | 00460 | 94760 | RC OXIMETER SPOTCHECK ADULT | $69.00 |
| 04/29/2011 | 00460 | | RC EDUCATION COUNTER | $0.00 |
| 04/29/2011 | 00460 | 94150 | RC INCENTIVE SPIR TX | $0.00 |
| 04/29/2011 | 00636 | J2405 | ONDANSETRON HCL 2MG/ML VIAL IV | $22.45 |
| 04/29/2011 | 00636 | J3010 | FENTANYL 250 MCG/5 ML AMP INJ | $27.75 |
| 04/29/2011 | 00636 | J1170 | HYDROMORPHONE HCL 1MG/ML DIS SYR INJ | $138.50 |
| 04/29/2011 | 00636 | J1100 | DEXAMETHASONE 4MG/ML INJECTION 5ML | $23.30 |
| 04/29/2011 | 00636 | J1100 | Dexamethasone 4mg/ml Injection 1ml | $22.65 |
| 04/29/2011 | 00636 | J1170 | HYDROMORPHONE HCL 2MG/ML DIS SYR INJ | $28.05 |
| 04/29/2011 | 00636 | J2270 | MORPHINE SULFATE 1MG/ML VIAL INJ | $67.80 |
| 04/29/2011 | 00636 | J7120 | RINGERS SOLUTION:LACTATED IVSL IV 104013 | $313.00 |
| 04/29/2011 | 00636 | J3010 | Fentanyl vial 50 mcg/ml 2 ml | $134.00 |
| 04/29/2011 | 00636 | Q0175 | PERPHENAZINE 4MG TAB PO | $5.65 |
| 04/29/2011 | 00636 | J2800 | METHOCARBAMOL 100MG/ML VIAL INJ | $201.80 |
| 04/29/2011 | 00636 | J2250 | MIDAZOLAM 1MG/ML 2ML VIAL | $26.40 |

### DEBBIE RODRIGUEZ
### AFFIDAVIT OF MERIT
### WEST CHESTER

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned states as follows:

1. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school. I am an orthopedic surgeon whose focus is on spine surgery and treatment of those with spine issues.

2. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

3. My curriculum vitae has been previously provided to opposing counsel in these Dr. Durrani cases and can be provided again upon request. For my review, I rely upon my education, training and experience.

4. I have not counted but I have reviewed, over 50 or more cases involving Dr. Durrani and the hospitals where he once had privileges.

5. I base my opinions in part on my review of all the cases I have reviewed which have revealed similar conduct by Dr. Durrani and the hospitals where he had privileges.

6. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

7. I am also familiar with applicable standard of care, policies, rules and regulations, medical executive committee bylaws, JCAHO requirements, credentialing, supervising, retention of medical staff, granting and rejecting privileges and the peer review process for West Chester Hospital, LLC, also referred to as West Chester Hospital or West Chester Medical Center and UC Health.

8. I have reviewed all relevant medical records including radiology of Dr. Durrani's medical treatment of Debbie Rodriguez and the medical treatment of Debbie Rodriguez at West Chester.

9. I have reviewed the Response to Summary Judgment in the Brenda Shell case and all the exhibits attached to it.

10. The Center for Advanced Spine Technologies, Inc. was Dr. Durrani's practice group and he was the sole owner, director and officer of CAST as well as an employee. CAST as such is also responsible for Dr. Durrani's negligence and for their failure to also supervise, discipline and retain Dr. Durrani.

11. I have also reviewed the nursing summary prepared by legal counsel's office for Debbie Rodriguez. Based upon the number of cases I've reviewed pertaining to Dr.

Durrani, legal counsel's office knows what materials I need to review and provides me those materials. In addition, while this affidavit contains case specific

information; it also contains information relevant to this case and/or many and/or most and/or all the other cases. It is prepared for me by counsel with my direction and approval like all of these have been.

12. Based upon my review, the following are the facts I rely upon:

A. Dr. Durrani performed eight surgeries on Debbie Rodriguez at West Chester Hospital:

10/28/09      Pre- and Post-Op Diagnosis: L3-L4 Facet Arthrosis
Procedure Performed: L3-L4 Posterior spinal instrumentation; L3-L4 Posterior spinal fusion using auto and allograft

*There was NO pre-op office visit for this surgery, only a one month post-op visit.*

03/17/10      Pre- and Post-Op Diagnosis: Pseudoarthrosis L3-L4 status post previous facet fusion; Failure of hardware L3-L4 facet screws
Procedure Performed: Direct lumbar interbody fusion L3-L4; Removal of previous facet screws; Posterior spinal instrumentation using large facet screws and fusion at L3-L4 using auto and allograft

03/31/10      Pre- and Post-Op Diagnosis: Degenerative lumbar disk disease L3-L4; Degenerative lumbar spinal stenosis L3-L4
Procedure Performed: Direct lumbar interbody fusion L3-L4; Placement of lateral interbody cage L3-L4; Division of instrumentation L3-:L4; Posterior spinal instrumentation L3-L4; Posterior spinal fusion using auto and allograft L3-L4
*There was no date on Durrani's Operative Report; date was found on Operative Report by Thomas Husted, MD.*

09/17/10      Pre- and Post-Op Diagnosis: Lumbar spinal stenosis L4-L5
Procedure Performed: Lumbar laminectomy L4-L5; Bilateral lumbar foraminotomies L4-L5

04/29/11      Pre- and Post-Op Diagnosis: Cervical degenerative disk disease C5-C6 and C6-C7; Cervical spinal stenosis C5-C6 and C6-C7; Cervical spondylosis C5-C6 and C6-C7
Procedure Performed: Anterior cervical discectomy C5-C6 and C6-C6; Anterior cervical fusion using auto and allograft C5-C6 and C6-C7; Placement of anterior interbody cages C5-C6 and C6-C7; Anterior cervical instrumentation C5-C6 and C6-C7

2

*Office visit dated 05/03/11 Durrani states that Ms. Rodriguez has a new complaint of swelling of the neck. This would be the direct result of using BMP-2 in her cervical surgery. Durrani prescribes Decadron.*

07/13/11    Pre- and Post-Op Diagnosis: C6-C7 foraminal stenosis; C6-C7 foraminal disk herniation on the left side
                Procedure Performed: C6-C7 left-sided hemilaminectomy; C6-C7 foraminal decompression left side

*Ms. Rodriguez's had a mild dehiscence of the incisional site and was given antibiotics.*
*She then developed the same symptoms on the right side and he recommended a foraminotomy, hemi-laminectomy and decompression at C5-C6, C6-C7 on the right side*

10/17/11    Pre- and Post-Op Diagnosis: Cervical spinal stenosis C5-C6 and C6-C7 right side; Cervical radiculopathy C5-C6 and C6-C7 right side
                Procedure Performed: Cervical laminectomy C5-C6 and C6-C7 right side; Cervical foraminotomy C5-C6 and C6-C7 right side

03/11/13    Pre- and Post-Op Diagnosis: Cervical stenosis; Cervical disk herniation C4-C5; Cervical spinal stenosis C4-C5; Bilateral foraminal stenosis C4-C5; Cervical radiculopathy C4-C5 bilaterally
                Procedure Performed: Anterior cervical discectomy C4-C5; Anterior cervical fusion using allograft; Placement of anterior interbody cage C4-C5; Anterior cervical instrumentation C4-C5

*Ms. Rodriguez developed neck swelling again with this cervical surgery. A CT showed a hematoma with possible infection.*

B.  The operative reports were dictated on:
    10/28/09    Dictated 10/28/09 at 1632

    03/17/10    Dictated 05/02/10 at 1422
                *Discharge Summary says "No procedures performed at this visit". The Discharge Summary was dictated 05/02/10 at 1425 after he dictated the Operative Report that did not happen.*

    03/31/10    Dictated 10/31/10 at 1346

    09/17/10    Dictated 11/03/10 at 1434

    04/29/11    Dictated 07/04/11 at 1059

| | |
|---|---|
| 07/13/11 | Dictated 07/13/11 at 1538<br>*Durrani's OR Out Time is 1500 which means he dictated this 38 minutes after he completed surgery* |
| 10/17/11 | Dictated 02/03/12 at 1831<br>*Durrani's out time was 1215 and Shanti's start time is 1225 which means a surgeon was not in the Operating Room for 10 minutes* |
| 03/11/13 | *There is no dictation date or time. Durrani signed the Operative Report 03/11/13 at 1550. Procedure was finished at 1405. This would indicate that the Operative Report was dictated and typed in less than two hours or it was done before the surgery.* |

C. The following was implanted:

| | |
|---|---|
| 10/28/09 | The Operative Report indicates that both auto and allograft was used but there is nothing on the Implant Log to say what was used *On the itemized billing statement there is nothing to indicate that either/or auto and/or allograft was used/billed.* |
| 03/31/10 | Infuse Set Bone Graft SM by Medtronic Inc Sofamor |
| 04/29/11 | Infuse Bone Graft SM 0.7ml by Medtronic Inc Sofamor |

D. The following hardware was implanted:

| | |
|---|---|
| 10/28/09 | ZIMMER 4.5 Washer (2)<br>ZIMMER Cannulated Bone Screw 4.5 x 26mm (1)<br>ZIMMER Cannulated Bone Screw 4.5 x 28mm (1) |
| 03/31/10 | ORTHOVITA Foam Bioact Vitoss Pack 5cc<br>MEDTRONIC Clydesdale 10x45mm (1)<br>SYNTHES USA SCR CANN 16 THRD 7.3x35mm ss (1)<br>SYNTHES USA WASH LG SCR 13mm ss (1) |
| 04/29/11 | ORTHOVITA VITOSS 1.2ml<br>DEPUY SPINE CAGE CERV BENGAL STD 7D 7mm (1)<br>DEPUY SPINE CAGE CERV BENGAL STD 7D 8mm (1)<br>DEPUY SPINE 34mm UNIPLATE (1)<br>DEPUY SPINE SCR CERV SD UNIPLT 15mm T1 (3) |
| 07/13/11 | ORTHOVITA VITAGEL SURGICAL HEMASTAT 4.5ml (1) |
| 03/11/13 | BIOMET Cellentra VCBM 1cc<br>MEDTRONIC INC SOFAMOR DANEK Standalone 16x14x6mm |
| (1) | |

MEDTRONIC INC SOFAMOR DANEK SCR SD 3.5x15mm  (2)

E. BMP-2 was used in two surgeries: one lumbar and one cervical. The FDA does
not approve the use of BMP-2 in the cervical spine due to the increased risk for
swelling. BMP-2 also carries a 3.5% increase risk for developing cancer.

F. Based on the radiologist written report I would question if any of the surgeries
were necessary except the second one where the hardware was replaced.
Certainly the proposed thoracic surgery was not necessary.

G. On the third office visit dated 09/22/09 Durrani recommended an L3-L4 facet
fusion (the first surgery) after receiving facet block in the same area. All other
surgeries transitioned from here.

H. Office note dated 02/25/10 Durrani states that the right L3-L4 facet screw has
completely backed out and that the CT scan shows that the left facet screw is
nowhere. Radiology reports indicate the screw had fractured and backed out
1.2cm.

I. Dr. Durrani misinterpreted the pre-operative diagnostic:

08/10/09        CT LUMBAR SPINE W CONTRAST AFTER MYELOGRAPHY
                IMPRESSION: Mild degenerative disc bulges at L2-L3 and L3-L4
                without stenosis or focal nerve root impingement

*Office visit dated 08/20/09 Durrani reviews the CT and Myelogram and states
Ms. Rodriguez has facet arthrosis at L3-L4and recommends a diagnostic facet
block at L3-L4*

*Office visit dated 09/22/09 Durranni recommends L3-L4 facet fusion after
obtaining the results of the facet block*

02/18/10        XX LUMBOSACRAL SPINE
                IMPRESSION: The right L3-L4 facet screw does not appear flush
                with the washer and facet

                CT LUMBAR SPINE W/3D REFOMATS W/O CONTRAST
                IMPRESSION: Moderate to severe left and severe right facet
                arthropahty; Status post bilateral facet joint screw fixation with
                apparent screw fracture of the right facet screw with 1.2cm of
                screw back out

*Office visit dated 02/25/10 Durrani states he has viewed both the x-ray and CT
scan. Durrani states the right L3-L4 facet screw has completely backed out and
the entire construct hinges on the left screw. However, this "left screw" is*

*confirmed on the CT scan to be "nowhere". Durrani recommends Lumbar interbody fusion at L3-L4.*

06/29/10     CT LUMBAR SPINE W/O CONTRAST
             IMPRESSION: A foraminal disc protrusion at L3-L4 which could
             provide mechanism for a left L3 radiculopathy

*Office visit dated 07/08/10 Durrani states the CT shows no explanation for Ms. Rodriguez's symptoms (06/24/10 pain in lower back, in the buttock and gluteal region that radiates toward the hip joint, anterior thigh, with numbness and tingling in her toes but does not indicate which side) because her symptoms are predominantly on the right side. Durrani also states that the rest of the CT is absolutely clean.*

*Office visit dated 08/31/10 Durrani reviews the same CT scan but this time states the PLIF cages (which he did not place) are placed far back and has developed a large bony osteophyte coming from the facet that is compressing the exiting nerve root at the L4-L5 level bilaterally. Durrani recommends L4-L5 laminectomy and decompression.*

01/28/11     MRI CERVICAL SPINE WO CONTRAST
             IMPRESSION: Mild bilateral foraminal stenosis at C5-C6
             secondary to bilateral paracentral and foraminal disc protrusions.
             No high-grade central canal or foraminal stenosis.

*Office visit dated 01/13/11 Ms. Rodriguez is still complaining of burning pain leg. Durrani states her second complaint is neck pain with headaches and radiating pain down the arm (but does not mention which arm). He orders an MRI of the Cervical spine.*

*Office visit 02/03/11 Durrani states that the MRI shows two large disk herniations at C5-C6 and C6-C7 which is causing ventral thecal sac impingement and compression of the spinal cord at C5-C6 and C6-C7. He recommends an ACDF and orders an MRI of the thoracic spine.*

02/18/11     MRI THORACIC SPINE WO CONTRAST
             IMPRESSION: Global minimal degenerative change in the
             thoracic intervertebral discs of doubtful architectural significance.
             Low grade S-shaped thoracolumbar curvature. Alignment is
             otherwise unremarkable. Thoracic spine and thoracic cord are
             otherwise unremarkable.

*Office visit dated 03/17/11 Durrani states the MRI shows almost the entire thoracic spine with severe disk degeneration and multiple levels of disk herniations causing severe foraminal stenosis at almost every level with right and left central stenosis. Durrani also mentions "a pretty exaggerated kyphotic*

6

*deformity". He recommends a VAT from T3-T12 but only after her cervical surgery that has already been scheduled.*

06/27/11    MRI CERVICAL SPINE WO CONTRAST
            IMPRESSION: in the surgical bed (C5-C7), hypertrophy of the
            posterior elements contributes to foraminal narrowing involving
            both left inlets greater than right.

*Office visit dated 06/28/11 Durrani states the MRI shows foraminal stenosis on the left side at C6-C7. Durrani recommends C6-C7 foraminal decompression and foraminotomy. Of note: Durrani decided to withhold the thoracic surgery.*

09/20/12    MRI CERVICAL SPINE W/WO CONTRAST
            IMPRESSION: C6-C7 foraminal narrowing appears less
            prominent than on the previous study, possibly due to technical
            factors.

*Office visit dated 05/08/12 Durrani is unable to an MRI he requested "because the previous hardware in there, the MRI was totally wiped out and no meaningful information can be obtained from the MRI". He orders a CT scan.*

*Office visit dated 12/08/12 Durrani mentions the MRI taken in September and shows a diffuse disk bulge at C4-5 which is causing compression of the nerve root. Durrani offers two solutions: epidural injections (which never work for her) and a C4-C5 ACDF.*

02/13/13    MRI CERVICAL SPINE WO CONTRALST
            IMPRESSION: Multilevel degenerative changes of the cervical

spine

06/10/13    XR CERVICAL SPINE AP LATERAL ODONTOID AND
            OBLIQUE W FLEXION AND EXTENSION
            IMPRESSION: There is evidence of loosening of the top and
            middle pairs screws of the lower plate. Those are the screws that
            are located at C5 and C6

*Office visit dated 06/11/13 Durrani states the X-Ray showed the anterior cervical discectomy and fusion cages at C4-C5, C5-C6 and C6-C7 all seem to be nicely placed.*

06/16/13    CT CERVICAL SPINE WO CONTRAST
            IMPRESSION: Multiple levels of mild left foraminal stenosis.

7

*Office visit dated 06/25/13 Durrani reviews the CT and states "I myself reviewed the images and also reviewed the report of the radiologist and tend to agree with the report of the radiologist" [That's a first]. He requests a new MRI of the Thoracic spine.*

07/03/13      MRI THORACIC SPINE WO CONTRAST
                 IMPRESSION: Stable exam with multilevel minimal degenerative disc disease. No compression fractures or cord abnormalities.

*Office visit dated 07/09/13 Durrani states the MRI shows "multiple levels of thoracic disk degeneration with exaggerated thoracic kyphosis" and recommends injections.*

*Then he was arrested and no other office visits were made.*

J.  Client has been to Mayfield Clinic. Office visit dated 09/17/13 where results of EMG indicate chronic left C5 radiculopathy, degenerative disc disease and chronic back pain.

K.  Ms. Rodriguez has stated that with each surgery her condition either stayed the same or worsened along with additional or new symptoms that were never resolved. Upon observation of her back you can see the screws protruding from her neck.

L.  Ms. Rodriguez has suffered years of pain, numbness, weakness and a general decrease in her quality of life. She can no longer hunt or fish with her husband which she could still do to some degree before being treated by Dr. Durrani. These surgeries have also taken away the intimacy of her marriage and put a strain on her husband both physically and financially.

13. Based upon my review, the following are my **opinions** based upon a reasonable degree of medical certainty pertaining to the deviation in standard of care or negligence, informed consent, battery and fraud claims against Dr. Durrani, CAST, West Chester and UC Health which proximately caused harm to Plaintiff:

    A.  Unnecessary surgery(s). Number of surgeries _8_ , Number unnecessary _6_

    B.  *Need to have additional surgery to repair problems created by Dr. Durrani*

    C.  Implantation of Puregen without informed consent

    D.  Implantation of BMP-2 without informed consent

    E.  Failed hardware

F. Failure to obtain proper informed consent for surgery

G. Failure to provide adequate and thorough pre-operative and post-operative patient surgical education

H. Failure to properly post-op monitor the patient

I. Failure to properly perform follow up, post-op care

J. Negligent surgical techniques

K. Failure to maintain accurate and complete surgical records and surgical consent forms

L. Failure to disclose important health information to patient

M. Failure to maintain and complete discharge summary

N. Failure to supervise Dr. Durrani

O. Negligent pre-surgical diagnosis

P. Failure to prepare a timely operative report or other medical record

Q. Billing for services not completed

R. Not informing the patient another surgeon will be doing all or part of the surgery

S. Practicing outside Dr. Durrani's scope of training, education, experience, and Board certifications

T. Deviation in standard of care

U. Failure to perform thorough and accurate pre-op nonsurgical evaluation

V. Failure by Dr. Durrani to inform patient of additional/changed procedure and reason

W. Failure by CAST to disclose additional/changed procedure and reason to patient

X. Failure by Dr. Durrani at CAST to properly educate patient regarding diagnosis

Y. Prior knowledge of possible complication and not acting properly upon same

Z. Failure to disclose pertinent health information to another health care provider

AA. Fraudulent, negligent and reckless pre-operative work up

BB. Fraudulent, negligent and reckless surgery

CC. Inaccurate, fraudulent, and/or exaggeration of diagnoses

DD. Failure to properly educate patient regarding diagnoses

EE. Failure to attempt non-surgical conservative treatment

FF. Failure to perform thorough and accurate pre-op nonsurgical evaluation

GG. Failure by Dr. Durrani at UC/West Chester Hospital to perform accurate and complete preoperative teaching

HH. Failure by Dr. Durrani at UC/West Chester Hospital to properly educate patient regarding diagnoses

II. Failure by Dr. Durrani at UC/West Chester Hospital to maintain accurate and/or complete medical records

JJ. Failure of informed consent by Dr. Durrani at UC/West Chester Hospital

KK. Failure of UC/West Chester Hospital to insure Dr. Durrani and CAST had obtained proper informed consent

LL. Failure of UC/West Chester Hospital to obtain proper acknowledgement of consent

MM. Failure by Dr. Durrani at UC/West Chester Hospital to disclose pertinent health information

NN. Failure by UC/West Chester Health to disclose additional/changed procedure and reason to patient

OO. Failure by UC/West Chester Health to supervise staff

PP. Failure by UC/West Chester Medical staff to properly document abnormalities and follow up care

QQ. Non-approved hardware combinations

10

RR.   Dr. Durrani made false and material misrepresentations of material facts intended to mislead Debbie Rodriguez and concealed material facts he had a duty to disclose. UC/West Chester Health and CAST concealed material facts they had a duty to disclose. Debbie Rodriguez was justified in relying on the misrepresentation and did rely proximately causing harm to Debbie Rodriguez. Dr. Durrani, CAST, and UC/West Chester Health intentionally misled Debbie Rodriguez. Debbie Rodriguez had the right to correct information.

14. The testimony, facts and exhibits of Brenda Shell's Response to Motion for Summary Judgment and Exhibits to same are applicable to all the claims against West Chester Medical Center (WCMC) and UC Health for all claims, including negligent retention and credentialing brought by Plaintiff.

15.   Based upon my review of the deposition testimony, the JCAHO requirements, the MEC bylaws and all the information provided to me, I am able to adopt the following opinions relating to WCMC and UC Health pertaining to the claims against them. WCMC's and UC Health's actions and inactions detailed in this affidavit proximately caused harm to Plaintiff. WCMC and UC Health are both being referenced when only WCMC is named. I hold the following opinions relative to WCMC and UC Health pertaining to their conduct acting through their administration and MEC. The time period covered is from the time Dr. Durrani sought privileges prior to WCMC opening in May 2009 through May 2013 when he no longer had privileges. In addition to my opinions, I set forth facts I rely upon. This includes all which I referenced that I reviewed. In addition to all of the above, I attest to the following:

## FACTS

1. According to West Chester's first Executive Vice President, Carol King, she did not explore the "rumors" about Dr. Durrani's leaving Children's.

2. According to Carol King, the hospital tracked problem issues yet WCMC have failed to produce the information under peer review protection.

3. According to circulating nurse, Janet Smith, presets were changed in the computer to indicate the procedure Dr. Durrani performed after the procedure.

4. According to Janet Smith, despite no one at West Chester never working with Dr. Durrani before, WCMC never checked him out.

5. According to former University Hospital President (a UC Health hospital), Brian Gibler, hospitals face financial challenges.

6. According to risk manager, David Schwallie, risk management knew Durrani had issues.

11

7. According to radiologist, Thomas Brown, there were surgeons questioning Durrani's decisions to perform surgery.

8. According to medical staff director, Paula Hawk, a policy called "stop the lying" was implemented the same year and month they kicked out Dr. Durrani. This infers a poor environment of honesty and disclosure before this policy.

9. According to Paula Hawk and as the director of medical staff, money is not supposed to trump patient safety.

10. According to Paula Hawk, she admits peer review is for hospitals to protect each other.

11. According to Paula Hawk, she admits hospitals are interested in volume, something Dr. Durrani provided for WCMC and UC Health.

12. According to Mike Jeffers, the director of finance, they tracked Dr. Durrani's financial numbers.

13. According to Mike Jeffers, he admits Dr. Durrani helped them in their time of need.

14. According to Mike Jeffers, Dr. Durrani was the highest money generator.

15. According to Mike Jeffers, he knew Dr. Durrani had more than one surgical suite assigned at once.

16. According to Mike Jeffers, bonuses were paid to him and others based upon finances.

17. According to Dr. Peter Stern, he knew Dr. Durrani was only "satisfactory," not a world class spine surgeon as West Chester advertised.

18. Dr. Stern doesn't deny admitting UC Health looked the other way on Durrani because of money.

19. According to credentialing manager, Ann Shelly, there was plenty of "public knowledge" about Dr. Durrani to check before credentialing.

20. According to Ann Shelly, West Chester relied on the NPDB they knew was protected by hospitals.

21. Dr. Eric Schneeberger, Dr. Durrani's partner, was on the MEC at WCMC.

22. According to Eric Schneeberger, West Chester knew about Durrani scheduling surgeries long into the day and night.

23. According to former nursing manager, Elaine Kunko, WCMC knew about Dr. Durrani not completing records.

24. According to Elaine Kunko, WCMC knew Dr. Durrani would claim surgeries were emergency when they were not.

25. According to Elaine Kunko, WCMC knew there was an issue with Dr. Durrani not being in the room doing surgery on "his" patient.

26. According to Elaine Kunko, even the OR nurses knew WCMC put up with Dr. Durrani for money.

27. According to Elaine Kunko, WCMC tracked Dr. Durrani's financial numbers.

28. According to perioperative director, Lisa Davis, WCMC knew Durrani's office is supposed to get consents so WCMC had an obligation to make sure they did.

29. According to Jill Stegman, the risk manager at West Chester, she knew Durrani had "issues."

30. Jill Stegman confirms Gerry Goodman's complaints.

31. According to Kathy Hays, WCMC knew how Dr. Durrani used BMP-2 and PureGen.

32. Dr. Tim Kremchek, the Chief of the Orthopedic department, failed to do his job under the MEC bylaws as it related to the supervision and review of Dr. Durrani.

33. According to Dr. Tim Kremchek, he knew Dr. Durrani was "sloppy."

34. Kevin Joseph, the CEO of WCMC, claims to know nothing about surgery operations in his hospital.

35. Kevin Joseph, the CEO, claims a hospital must protect patients from unnecessary harm "as much as they can."

36. Kevin Joseph, the CEO, claims WCMC doesn't have oversight of surgeons doing what Plaintiff claims Durrani was doing. (Despite what his bylaws state.)

13

37. Kevin Joseph, the CEO, denies the hospital has any responsibility if Dr. Durrani did an unnecessary surgery.

38. Kevin Joseph, the CEO, despite his finance office tracking it, denies any knowledge of BMP-2 use.

39. Kevin Joseph, the CEO, denies knowing about any complaints about Dr. Durrani.

40. Kevin Joseph, the CEO, admits they benefited financially from Dr. Durrani, including his own pay.

41. Mark Tromba, the OR manager, admits BMP-2 use as used by Dr. Durrani.

42. According to Jeff Drapalik, the Senior Leadership team, including Joseph, met weekly and reviewed numbers.

43. According to Jeff Drapalik, the CFO of WCMC knew Dr. Durrani was a high volume money maker.

44. Lesley Gilbertson, a member of the MEC of WCMC, and anesthesiologist working with Durrani, had a concern about how long Durrani kept patients under.

45. According to materials manager, Dennis Robb, WCMC knew the volumes of BMP-2 being used.

46. According to Karen Ghaffari, WCMC knew the chart documentation of Dr. Durrani was not in compliance with their bylaws.

47. Patrick Baker, nursing VP at WCMC admits WCMC tracked the financial performance of Dr. Durrani.

48. According to nurse, Vicki Scott, the administration of WCMC knew from the outset of West Chester all the serious issues pertaining to Dr. Durrani.

49. According to Vicki Scott, West Chester's risk manager began to ignore complaints from Ms. Scott.

50. According to Vicki Scott, staff was scared to speak out.

51. According to Vicki Scott, patients didn't know who did the surgeries—Shanti or Durrani.

52. According to Vicki Scott, records were not accurate who was in the OR at what time.

14

53. According to Vicki Scott, everyone at WCMC knew it was about money.

54. According to Vicki Scott, WCMC knew about Dr. Durrani's and West Chester's illegal use of PureGen.

55. According to Vicki Scott, Dr. Durrani was a behavior problem.

56. According to patient representative, Elizabeth Dean, WCMC tracked Dr. Durrani's volumes from the outset and the CFO loved what he saw.

57. According to Elizabeth Dean, WCMC knew Dr. Durrani had issues at Children's.

58. According to Elizabeth Dean, WCMC knew Dr. Durrani was performing unnecessary procedures by volumes and repeats.

59. According to nurse, Scott Rimer, WCMC knew Dr. Durrani waited until after surgeries to document what procedures were planned.

60. According to Scott Rimer, patients at WCMC had procedures they did not consent to and WCMC knew it.

61. According to Scott Rimer, sterile fields were not protected.

62. According to Scott Rimer, WCMC knew PureGen was being used by Dr. Durrani and allowed it.

63. According to Thomas Blank, PureGen was an alternative to BMP-2, which WCMC turned to based upon insurance denials of BMP-2. In addition, Dr. Durrani operated an unethical POD of Alphatech called Evolution Medical to sell PureGen to West Chester.

64. According to Gerry Goodman, WCMC tracked BMP-2 use by Dr. Durrani; patients did not know who at times performed their surgery Dr. Shanti or Dr. Durrani; electronic records had to be changed after Dr. Durrani's surgery; Dr. Durrani and WCMC never obtained informed consents; Dr. Durrani's volume was a warning sign of overutilization. Gerry Goodman reported all these concerns to WCMC and there was no action. Gerry Goodman was told and concluded that WCMC did not want to do anything about Dr. Durrani because of money rewards.

## ADDITIONAL OPINIONS

65. The Center of Advanced Spine Technologies (CAST) negligently supervised and retained Dr. Durrani, including by allowing Dr. Durrani to perform

15

unnecessary procedures and surgeries; use BMP-2 and/or PureGen without appropriate consent; failing to disclose Dr. Shanti and others involvement in surgery; improper billing; changing the pre-op and post-op records to coincide when the surgery was not the surgery disclosed; and all other conduct detailed in the documents I reviewed.

66. WCMC, UC Health and CAST's motive for their actions and inactions towards Dr. Durrani was financial gain.

67. The MEC, administration and Boards of WCMC and UC Health failed to "govern the affairs of the Medical Staff."

68. The MEC, administration and Boards of WCMC and UC Health failed to enforce their rules upon Dr. Durrani as they were required to do.

69. The MEC, administration and Boards of WCMC and UC Health failed to provide oversight of Dr. Durrani as they were required to do.

70. The MEC, administration and Boards of WCMC and UC Health failed to properly evaluate Dr. Durrani.

71. The Orthopedic and Surgery Departments abdicated their responsibility under the MEC bylaws to review, investigate and supervise Dr. Durrani.

72. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline Dr. Durrani including summary suspensions and revocation.

73. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline under the MEC bylaws as it pertains to Dr. Durrani.

74. The MEC, administration and Boards of WCMC and UC Health ignored the information readily available pertaining to Dr. Durrani before credentialing and granting him privileges.

75. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's disruptive behavior, unprofessional behavior and clinical performance placing Plaintiff at risk.

76. The MEC, administration and Boards of WCMC and UC Health certified and approved the unnecessary procedures of Dr. Durrani on Plaintiff knowing they were unnecessary and knowingly allowing the improper use of BMP-2 and/or PureGen and knowing there was not proper informed consent.

77. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's failure in medical record documentation.

16

78. The MEC, administration and Boards of WCMC and UC Health failed to require Dr. Durrani to follow the rules for off label experimental procedures.

79. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to use undisclosed and unqualified surgeons to perform his surgeries including Dr. Shanti.

80. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to do multiple surgeries at once.

81. WCMC and UC Health have refused to provide as privileged the peer review information from WCMC for Dr. Durrani to either me or their own expert. Therefore, we have no knowledge of what action, if any, was taken against him. However, based upon the facts here, it is obvious they failed to take action.

82. Based upon all of the above, it's my opinion that WCMC and UC Health were negligent in their credentialing, supervising, disciplining and retaining Dr. Durrani on staff and allowing him to obtain and keep privileges at WCMC under the standards of Ohio as detailed in the Brenda Shell's Response to Motion for Summary Judgment and this proximately caused harm to Plaintiff.

83. The facts support Debbie Rodriguez' claim for negligence, battery, lack of consent and fraud.

84. As a result of the negligence and conduct of Dr. Durrani, CAST, West Chester and UC Health, Debbie Rodriguez suffered damages proximately caused by them, including the following:

A. Permanent disability
B. Physical deformity and scars
C. Past, Current and Future Physical and Mental Pain and Suffering
D. Lost income past, present and future
E. Loss of enjoyment of life
F. Past medical expenses
G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
H. Aggravation of a pre-existing condition
I. Decreased ability to earn income
J. 3% increased risk of cancer and fear of cancer if BMP-2 was used.

AFFIANT SAYETH FURTHER NOT

17

KEITH D. WILKEY, M.D.

NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by

Keith D. Wilkey, M.D. on this ___7___ day of ~~May,~~ July, 2014.

NOTARY PUBLIC

My Commission Exp.: 04/18/2015

St. Charles County

State of Missouri

ANGELA POINSETT
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Charles County
My Commission Expires: July 18, 2015
Commission #11396613

18

```
                         COURT OF COMMON PLEAS
                         HAMILTON COUNTY, OHIO
```

DEBBIE & JOE RODRIGUEZ
       **PLAINTIFF**

                                              Use below number on
                                              all future pleadings

       -- vs --
                                        No.   A 1601532
                                                SUMMONS

ABUBAKAR ATIQ DURRANI M D
       **DEFENDANT**


       UC HEALTH
       % GH R BUSINESS SVCS INC                    D - 4
       511 WALNUT ST 1900 5TH 3RD CTR
       CINCINNATI OH 45202


You are notified
that you have been named Defendant(s) in a complaint filed by

       DEBBIE RODRIGUEZ
       745 REEVES ROAD
       DRY RIDGE KY 41035

                                                       Plaintiff(s)

in the Hamilton County, COMMON PLEAS CIVIL Division,
**TRACY WINKLER, 1000 MAIN STREET   ROOM 315,
CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's
attorney, or upon the plaintiff, if he/she has no attorney of record, a
copy of an answer to the complaint within twenty-eight (28) days after
service of this summons on you, exclusive of the day of service. Your
answer must be filed with the Court within three (3) days after the
service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to
file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered
against you for the relief demanded in the attached complaint.


Name and Address of attorney          TRACY WINKLER
MATT HAMMER                           Clerk, Court of Common Pleas
5247 MADISON PIKE                       Hamilton County, Ohio
INDEPENDENCE        KY
41051

                                      By   RICK HOFMANN
                                                        Deputy

                                      Date:   March 16, 2016

D113851636

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

DEBBIE & JOE RODRIGUEZ
**PLAINTIFF**

Use below number on
all future pleadings

-- vs --

No. A 1601532
SUMMONS

ABUBAKAR ATIQ DURRANI M D
**DEFENDANT**

WEST CHESTER HOSPITAL LLC
% GH R BUSINESS SVCS INC                    D - 3
511 WALNUT ST 1900 5TH 3RD CTR
CINCINNATI OH 45202

You are notified
that you have been named Defendant(s) in a complaint filed by

DEBBIE RODRIGUEZ
745 REEVES ROAD
DRY RIDGE KY 41035

Plaintiff(s)

in the Hamilton County, COMMON PLEAS CIVIL Division,
**TRACY WINKLER, 1000 MAIN STREET   ROOM 315,
CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's
attorney, or upon the plaintiff, if he/she has no attorney of record, a
copy of an answer to the complaint within twenty-eight (28) days after
service of this summons on you, exclusive of the day of service. Your
answer must be filed with the Court within three (3) days after the
service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to
file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered
against you for the relief demanded in the attached complaint.

Name and Address of attorney              TRACY WINKLER
MATT HAMMER                               Clerk, Court of Common Pleas
5247 MADISON PIKE                           Hamilton County, Ohio
INDEPENDENCE          KY
41051

By  RICK HOFMANN

Deputy

Date:   March 16, 2016

D113851568